**AVEDA CORPORATION, Plaintiff,**

**v.**

**EVITA MARKETING, INC., Harry Eugene Cassidy, and Cassidy, Inc., Defendants.**

**Civ. No. 4–88–329.**

United States District Court,
D. Minnesota,
Fourth Division.

March 2, 1989.

Wood R. Foster, Jr., Grossman, Karlins, Siegel & Brill, Minneapolis, Minn., for plaintiff.

Earl D. Reiland, Merchant, Gould, Smith, Edell, Welter & Schmidt, P.A., Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

Plaintiff, the manufacturer of Aveda hair and skin care products, has brought an action for trademark infringement against the defendants which manufacture a line of shampoos and conditioners bearing the name Avita. Two motions are before the Court—plaintiff's motions for a preliminary injunction prohibiting defendants from further infringement on its trademark and for summary judgment in plaintiff's favor on defendants' counterclaim for cancellation of plaintiff's trademark. The motions will be granted.

FACTS

Plaintiff, Aveda Corporation (Aveda), holds federal trademark registrations on the name "Aveda" [1] and on a design consisting of an upside-down triangle with a wildflower illustration inside and the Aveda logo along one side.[2] Aveda products have been sold since 1978 when Aveda's predecessor corporation, Horst & Friends, Inc., changed its corporate and brand names in order to market its products throughout the United States and Canada. The Aveda line was originally the "Horst" brand of shampoos and conditioners. It had been developed by Horst Rechelbacher for sale in his Twin Cities beauty salons. Aveda products are specially formulated to meet specific hair care needs. They are expensive, and sold only through authorized salons and beauty schools. Aveda claims to market its products this way in order to insure that customers consult with specially trained hair dressers able to match the

1.  Trademark Registration No. 1229134.

2.  Trademark Registration No. 1368506.

particular Aveda products appropriate to each customer's individual needs. Aveda's marketing approach has clearly been a success, as its annual sales for 1988 will approach $30 million.

The defendant, Evita Manufacturing, Inc. (EMI), introduced its line of Avita hair care products in late 1987. EMI is owned by Harry Eugene Cassidy, who was once a business associate of Horst Rechelbacher. Cassidy and another corporation in which he has controlling interest, Cassidy, Inc., are also named as defendants in this action. Avita products are the only products sold by EMI. Like Aveda products, the Avita line consists of expensive and specially formulated products designed to appeal to a select group of consumers. Avita is sold through beauty salons "with the very detailed and personal involvement of hair stylists in explaining the unique nature" of the products, but may also be sold in any retail establishment. Affidavit of Harry Eugene Cassidy, Par. 12. After attorneys representing Aveda contacted EMI and asserted that the name Avita infringed on Aveda's trademarks, EMI changed the Avita name by putting horizontal lines over two vowels, the initial "A" and the "i." The lines, if read as pronunciation symbols, suggest that Avita should be pronounced "Ay-vite-uh."

EMI has registered the name "Avita" as a trademark. The examining attorney at the Patent and Trademark Office "found no registered or similar pending mark which would bar registration." Cassidy Aff., Exh. I.

*The Name "Aveda"*

In 1978 Horst & Friends, Inc. and the Horst brand were renamed Aveda Corporation and Aveda, respectively. The parties dispute who originally conceived of the word "Aveda" and also whether it is an original word coined to be used as a trade name or a descriptive word that is simply an abbreviation of ayurveda, a Sanskrit word for the science of herbal remedies.

EMI claims that the Aveda name originated with Cassidy, who was at the time the private label manufacturer for Horst & Friends, Inc. In that capacity, Cassidy and his corporation, Cassidy, Inc., were under contract to Horst & Friends, Inc. (and later Aveda) to assist in formulating products, to develop the correct proportions of ingredients, to handle the manufacturing and bottling and to silkscreen the bottles containing the product. Deposition of Harry Eugene Cassidy at 45. Cassidy, Inc. has served as private label manufacturer for as many as 1,500 customers. Cassidy Dep. at 45.

Cassidy claims to have been present at a meeting with Rechelbacher and two other officers of Horst & Friends when the Aveda name was adopted. According to Cassidy, someone suggested the word "ayurvedic" as the new name. Cassidy Dep. at 40. Cassidy claims that he responded by pointing out that ayurvedic did not have a pleasant sound in English and suggesting the softer sounding name, Aveda, instead. Cassidy Dep. at 40. Cassidy also claims that he had an important role in creating the registered design, having suggested "the angling across the bottle, the insertion of the name in it's [sic] location, the alternating of color and the insertable or removable lines." Cassidy Dep. at 48. Aveda accepts these claims as true for the purpose of these motions only.

The parties agree that "Aveda" is derived from the word ayurveda. Aveda argues that it is an original word, coined from ayurveda, while EMI argues that it is merely a shortened form of the word ayurveda which is descriptive of the ayurvedic (herbal) mix in the product.

In 1980 Cassidy, Inc. decided that it did not wish to act as the private label manufacturer of Aveda products any longer because "[w]e couldn't manufacture it in a manner satisfactory to protect ourselves" from product liability actions for skin irritation related to the inconsistency of the manufactured product. Cassidy Dep. at 68. Accordingly, Aveda purchased the formulas from Cassidy, Inc. and arranged to have the products manufactured elsewhere. Cassidy Dep. at 69.

At no time prior to this lawsuit did Cassidy give any indication to Aveda or its agents that he claimed any interest in the

name "Aveda." Cassidy Dep. at 70. The only time Cassidy made any statement remotely like a claim of an interest was at the meeting when "Aveda" was coined. Cassidy Dep. at 70. Cassidy said only "I think that I have a good name for this." Cassidy Dep. at 70. Ownership of the name was not discussed at that time. Cassidy Dep. at 71.

### Registration of the Aveda Trademark

EMI's counterclaim for the cancellation of the Aveda registration is based on claims that Aveda made two misrepresentations in its application for a trademark. The first alleged misrepresentation is Aveda's answer on the trademark application to the question of whether the Aveda mark had any particular meaning. Aveda answered that it did not. EMI claims that this is a false answer because "Aveda" is merely descriptive of the ayurvedic mix in the product.

The second alleged misrepresentation concerns the date of first use listed in the trademark registration application for the Aveda triangle design filed July 7, 1983. The date of first use is given as September 5, 1978. In fact, the design used in 1978 did not have a wildflower inside the triangle. Deposition of Horst M. Rechelbacher at 18–19. The wildflower was added at some point between the date of first use and the application for trademark registration.

### Evidence on the Likelihood of Confusion

Aveda presents three types of evidence supporting its claim that Avita will be confused with Aveda; an affidavit from an expert in linguistics, a market survey on the pronunciation of the two brand names, and affidavit testimony that several beauty salons and schools are representing Avita to be basically the same as Aveda.

Aveda presents the affidavit of Genevieve Escure, associate professor of English and linguistics at the University of Minnesota. Escure states that "Aveda" and "Avita" will be pronounced similarly by the average English speaker. Affidavit of Genevieve Escure, Par. 4a. Escure's conclusion is based on two principles of English pronunciation. First, the consonants T and D tend to be pronounced alike in casual speech whenever the T or D falls between vowels and the second vowel is unstressed. Escure Aff., Exh. B at 1–2. Some examples are metal and medal, betting and bedding, writing and riding or rated and raided. *Id.* Second, the letters E and I correspond to a number of different pronunciations, at least two of which are shared.[3] This permits the middle vowels in "Avita" and "Aveda" to be pronounced the same. *Id.* at 2. Escure further states that the pronunciation suggested by EMI's placement of horizontal marks over the "A" and "i" in Avita violates the "stress-assignment rules of English," which do not allow two consecutive syllables both bearing primary stress. Escure Aff., Par. 4c and Exh. D. Finally, Escure states that the horizontal lines used by EMI are not generally recognized as pronunciation guides by lay people. Escure Aff., Par. 4b. Escure therefore concludes that Aveda and Avita are likely to be confused. Escure Aff., Par. 4d.

Aveda also conducted a survey in which a professional market researcher asked forty women over the age of eighteen to pronounce the words "Aveda," "Avita," and "A̅vi̅ta." Thirty-seven pronounced "Avita" either "ah-veed-uh" or "ah-veet-uh." Twenty-five pronounced "A̅vi̅ta" as "ay-veet-uh" or "ah-veet-uh," only six pronounced it as "ay-vite-uh." Thirty-three out of forty women pronounced "Aveda" as "ah-vee-duh." Only two of the women sampled were recorded as pronouncing the two marks exactly the same.

Aveda bolsters its survey research with the Affidavit of Michael Houston, research professor and chair of the department of marketing at the University of Minnesota. Houston is also the editor of the *Journal of Marketing Research.* Houston states that the survey demonstrates consumers' inability to distinguish between the three

---

3. For example, the letters E and I both correspond to the [i] sound in prece de and machi ne, or me ter and li ter. Those two letters also correspond to the [E] sound in be tter, me tal, and certain dialectical pronunciations of pi n and pe n. Excure Aff., Exh. B at 2.

brand names. The survey results are, according to Houston, "sufficiently strong to suggest a high potential for confusion on the part of consumers" because of the phonetic similarity. Affidavit of Michael Houston par. 7. Houston also states that this study was done in a manner consistent with industry standards for pilot study investigations and that market researchers would rely on its results as an indicator of the outcome of more elaborate testing.

Finally, Aveda's counsel presents five affidavits as evidence that several beauty schools and salons are representing Avita to be basically the same as Aveda. First, counsel for Aveda had a legal assistant, Kelly A. Jeanetta, call three Beaute Techniques salons. Cassidy owns the Beaute Techniques chain. In these calls, Jeanetta claimed to be looking for a product that she had used in the past and, although Jeanetta claimed she could no longer remember its full name, she said she thought the name began with an "A." At the first salon, Jeanetta was told that both Aveda and Avita were available and that the two were basically the same product. Affidavit of Kelly A. Jeanetta, Par. 2. At the second salon, Jeanetta was told that the product that she used was probably Aveda, but that this particular salon carried Avita, not Aveda. Jeanetta Aff., Par. 3. Jeanetta asked if Avita and Aveda contained the same ingredients and whether they were manufactured by the same company. The person responding said that she thought they had the same ingredients and that "her boss helped make the Aveda product, and then manufactured Avita." Jeanetta Aff., Par. 3. At the third salon, Jeanetta was told that she must have been using Aveda. Jeanetta Aff., Par. 4. Jeanetta was informed that the salon carried Aveda, but that an improved product had just come out named Avita. Jeanetta Aff., Par. 4. Jeanetta was told that the owner of Beaute Techniques manufactured the original Aveda product, but had since moved on and developed Avita. Jeanetta Aff., Par. 4. Jeanetta was told that Avita contained the same basic ingredients as Aveda, with some improvements. Jeanetta Aff., Par. 4.

A second affidavit is by Patricia V. Rosado, district manager for Quality Beauty and Health Supply, an authorized distributor for Aveda. Rosado states that the Hairtage Beauty Colleges in Murry, Utah and Salt Lake City, Utah were using Aveda products on customers while selling only Avita products retail. Affidavit of Patricia V. Rosado, Par. 2, 3. Because of the confusion this could engender among Hairtage's customers, Aveda has ceased sales to Hairtage. Aveda's Reply Memorandum at 1.

Susan Wageman is a salesperson for Quality Beauty and Health Supply. In another affidavit submitted by Aveda, Wageman states that she asked personnel at the A & D Beauty Supply Co. "if the Avita product they sell is the same as Aveda." Affidavit of Susan Wageman, Par. 2. Wageman claims that she was told that Shiv Nath Tandon, who formulated the original Aveda product, had left Aveda and was marketing the original Aveda product under the name Avita. Wageman Aff., Par. 2.

Aveda also presents an affidavit by Regina Newton, a sales consultant for Progressive Beauty, an Aveda distributor in Iowa. Newton claims to have gone into a Beaute Techniques salon in Iowa City, Iowa and asked if the salon carried Aveda. Affidavit of Regina Newton, Par. 2. Newton was told that the salon did not carry Aveda, but it did carry Avita. When Newton asked if Avita was the same as Aveda, she was told that it was. Newton Aff., Par. 3. Newton asked how Avita could copy Aveda and was told that Rechelbacher had a falling out with a former partner, Cassidy, and as a result Cassidy was manufacturing his own product. Newton Aff., Par. 4. Newton also says that she had been hearing rumors from clients that "Aveda was coming out with a new product line, apparently this Avita product." Newton Aff., Par. 5.

Aveda's last affidavit is by Stefany Reed, a sales coordinator for Progressive Beauty in Iowa. Reed went to the same Iowa City salon to which Newton had been. She told the clerks that she was going to be opening a salon, had heard about Avita and wanted

to know more about it. Affidavit of Stefany Reed, Par. 2. The clerks at that salon told her that Avita was "just like Aveda." Reed Aff., Par. 3. Reed was told that Avita was manufactured by the person who had "come up with the original concept for Aveda," and since had a falling out with Rechelbacher. Reed Aff., Par. 3.

DISCUSSION

*Aveda's Motion for Summary Judgment*

■ In considering a motion for summary judgment, a court must view the facts most favorably to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Hartford Accident & Indemnity Co. v. Stauffer Chemical Co.*, 741 F.2d 1142, 1144–45 (8th Cir.1984). Summary judgment may be granted only if no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Aveda seeks summary judgment with regard to defendants' counterclaim. The basis of the counterclaim is defendants' contention that Aveda made fraudulent statements concerning the descriptiveness of its mark and the date of first use in order to obtain its trademark registrations. Defendants ask for cancellation of the registrations and damages because of the misrepresentations.

■ The courts and the trademark board both view charges of fraud in the registration of a trademark as a disfavored defense. 2 McCarthy, *Trademarks and Unfair Competition 2d* § 31:21(B)(5). Trademarks are created by use, not registration. Federal registration creates valuable substantive and procedural rights, but the common law creates the underlying right to exclude. Thus, even if a plaintiff's registration is shown to be fraudulently obtained, the plaintiff's common law rights in the mark may still support an injunction against an infringing defendant. *See, e.g., National Trailways Bus System v. Trailway Van Lines, Inc.*, 269 F.Supp. 352, 155 U.S.P.Q. 507, 510 (E.D.N.Y.1965). Moreover, the trademark registration, contrary to patent procurement, is not an adversary process. The stringent standards of disclosure applicable to patent applications are therefore not appropriate to applications for trademark registrations. 2 McCarthy, *Trademarks and Unfair Competition 2d* § 31:21(B)(2). Thus, the law provides that a false statement in an application for trademark registration will justify cancellation of the registration only if the statement misrepresents a material fact and the statement was made with an intent to defraud. *Allen Homes, Inc. v. Weersing*, 510 F.2d 360, 184 U.S.P.Q. 705, 706–07 (8th Cir.), *cert. denied,* 421 U.S. 998, 95 S.Ct. 2395, 44 L.Ed.2d 665 (1975); *Dr. Vinyl & Associates v. Repair-It Industries, Inc.*, 220 U.S.P.Q. 639, 647 (TMTAB 1983).

The first false statement allegedly made by Aveda in its applications for trademark registration concerns an inquiry by the trademark office asking whether the Aveda mark had any particular meaning. *See,* Deposition of Horst M. Rechelbacher, Exh. 6. Defendants claim that Aveda answered by saying that the mark did not have any particular meaning when, in fact, the mark refers to the ayurvedic (herbal) mix that is part of the product and product concept. Aveda's response to the Trademark Office's inquiry was;

the term Aveda is derived from the Sanskrit word Ayurveda, which means "the science of medicine and the prolonging of life with nature's healers." The term has no independent meaning or signifi-

cance in either general usage or the hair care industry or trade. Rechelbacher Dep., Exh. 4. Defendants have demonstrated nothing false or misleading about Aveda's response.[4]

The second false statement defendants rely upon concerns the date of first use listed on Aveda's application to register its triangle design, filed on July 22, 1983. The date of first use is given as September 5, 1978, although at that date the design used did not include the illustration of a single stem of wildflowers in the triangle. The wildflower illustration was added to the design sometime after 1978, but before the application was filed. Aveda admits that the date listed is incorrect. Plaintiff's Reply Memorandum at 3. However, the false statement is not material. Defendants do not in any way suggest that the registration would have been denied had the true date of first use been provided on the application. The Trademark Board has consistently held that a misstatement of the date of first use in an application for registration is not fraudulent as long as there has been some use of the mark prior to the filing date. *Colt Industries Operating Corp. v. Olivetti Controllo Numerico S.p.A.*, 221 U.S.P.Q. 73, 76 (TMTAB 1983); *CarX Service Systems, Inc. v. Exxon Corp.*, 215 U.S.P.Q. 345, 351 (TMTAB 1982); *Visual Information Institute, Inc. v. Vicon Industries, Inc.*, 209 U.S.P.Q. 179, 185–86 (TMTAB 1979).

Because defendants have failed to produce any evidence establishing a genuine issue of fact concerning a material misrepresentation which would be grounds for cancellation of Aveda's trademark registrations, the Court will grant Aveda's motion for partial summary judgment and dismiss defendants' counterclaim.

### Motion for a Preliminary Injunction

The owner of a federally registered trademark is authorized to petition for a preliminary injunction in order to prevent the further use of an infringing mark.

> The several courts ... shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office.

15 U.S.C. § 1116(a).

The test for granting a preliminary injunction in trademark infringement litigation is the same test applied in other areas of law. The familiar test set forth in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir.1981) involves the consideration of four factors:

> (1) the threat of irreparable harm to the movant;

> (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant;

> (3) the probability that movant will succeed on the merits; and

> (4) the public interest.

*Dataphase*, 640 F.2d at 114.

### I. Probability of Success at Trial

To demonstrate a probability of success on the merits, Aveda must prove ownership of a valid trademark and a likelihood that the allegedly infringing mark would be confused with the registered mark. *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 230 U.S.P.Q. 441, 442–43 (7th Cir. 1986).

#### A. *Ownership of a Valid Trademark*

■ A certified copy of the certificate of registration of a federally registered trademark provides *prima facie* evidence of the registrant's ownership of the mark. 15 U.S.C. § 1057(b). Aveda has attached copies of its federal registrations of the Aveda name and Aveda triangle design to its complaint as exhibits 1 and 2. These are not

---

**4.** In its supplemental memorandum, defendants argue that Prakash Purohit, Aveda's executive vice president of research and development, has "admitted" that the name Aveda is descriptive. The so-called admission is the statement "ayurvedic means herbal extracts being used in the product." Deposition of Prakash Purohit at 109. Defendants' argument is baseless. The statement does not concern the name "Aveda," and in no way suggests that Aveda's application for trademark registration was false.

the certified copies required by the statute, but defendants do not dispute the registration of Aveda's marks.

Defendants do, however, contest the validity of Aveda's marks in two ways. Defendants claim that the marks were fraudulently obtained and, for that reason, invalid. These challenges are the basis for defendants' counerclaim and have been found meritless. But, in addition, defendants claim that Cassidy, rather than Aveda, was the first to put the Aveda mark to use and therefore has a superior right to that mark.

In contrast to patent law, rights in trademarks are not gained through discovery or invention of the mark, but only through actual use. *G. & C. Merriam Co. v. Saalfield*, 198 F. 369 (6th Cir.1912). Trademark priority is not automatically granted to the person who was first to conceive of the idea of using a given symbol as a mark. *Bayuk Cigars, Inc. v. Schwartz*, 1 F.Supp. 283, 286 (D.N.J.1932). The validity of a trademark does not depend on novelty, invention or discovery. *See, Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 119 F.2d 316, 49 U.S.P.Q. 419, 424 (6th Cir.1941), *rev'd on other grounds*, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942).

To acquire ownership of a trademark, one must actually use the mark in the sale of goods or services. No rights accrue to one who merely selects a trademark without actual use of it in the advertising or sale of goods. *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916); *La Maur, Inc. v. Internat'l Pharmaceutical Corp.*, 199 U.S.P.Q. 612, 616 (TMTAB 1978). A merchant is the owner of a trademark "if he applies or has someone in his behalf apply his own trademark to goods to which he has acquired ownership and title and sells or merely transports such goods in commerce as his own product." *Standard Pressed Steel Co. v. Midwest Chrome Process Co.*, 183 U.S.P.Q. 758, 765 (TMTAB 1974). When a dealer buys goods from a manufacturer and orders the manufacturer to place its mark on the product prior to delivery, then the manufacturer is at best

acting as a licensee of the dealer. *See, Wrist–Rocket Mfg. Co. v. Saunders*, 379 F.Supp. 902 (D.Neb.1974), *aff'd in part and reversed in part*, 516 F.2d 846 (8th Cir.), *cert. denied*, 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975). "Certainly, use of the trade name by the licensee builds up no right in the licensee as against the licensor." *Pike v. Ruby Foo's Den, Inc.*, 232 F.2d 683, 685 (D.C.Cir.1956).

Cassidy claims to have been the originator of the word Aveda and to have made an important contribution to the Aveda triangle design. Cassidy further claims that he "was the first person to adopt and apply" the "Aveda" name and design on bottles. Cassidy Aff., par. 15. At the time, however, Cassidy (in the form of Cassidy, Inc.) was acting as the private label manufacturer for Aveda. As such, Cassidy was under contract to formulate, manufacture and package products for Aveda. Aveda was at all times the only customer of Cassidy, Inc. for Aveda products. Cassidy Dep. at 62. Aveda was marketing and distributing the product and retaining all of the proceeds of the sales. Defendants do not contend that any form of joint venture existed. Aveda simply contracted with Cassidy, Inc. to manufacture and bottle its product. This arrangement ended in 1980 when Cassidy, Inc. terminated the contract and Aveda purchased the product formulas.

Cassidy's claim to a superior right in the Aveda mark because he originally developed the mark fails because ownership of a mark depends on use, not invention. Although Cassidy claims that he was the first to use the Aveda mark, Cassidy was acting as the licensee of Aveda and, as such, could take no rights in the mark.

### B. *Likelihood of Confusion*

The test for trademark infringement is whether the allegedly infringing mark is "likely to cause confusion, or to cause mistake, or to deceive" potential customers of the trademark owner. 15 U.S.C. § 1114(1)(b). A likelihood of confusion exists if an appreciable number of reasonable buyers are likely to be confused by the similar marks. 2 McCarthy, *Trademarks*

*and Unfair Competition 2d* § 23.1(B) (1984); *McGregor Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 202 U.S.P.Q. 81, 86 (2d Cir.1979). Resolution of this issue depends on consideration of:

(1) the strength of the infringed mark;

(2) whether the marks, examined as a whole, are similar;

(3) the degree to which the products compete with each other;

(4) intent on the part of the alleged infringer to pass off its goods as the product of another;

(5) evidence of actual confusion;

(6) whether the kind of product, its cost and conditions of purchase, allow the purchaser to eliminate the likelihood of confusion which would otherwise exist.

*See, Squirtco v. Seven–Up Co.*, 628 F.2d 1086, 1091, 207 U.S.P.Q. 897, 900 (8th Cir. 1980).

### 1. The Strength of Aveda's Mark

Generally, the strength of a mark depends on two factors—the distinctiveness of the mark and the extent to which the mark is recognized by the relevant consumer class. 2 McCarthy, *Trademarks and Unfair Competition 2d* § 11:1. EMI argues that the Aveda mark is weak because the word "Aveda" is a descriptive term which simply identifies the ayurvedic nature of the product. Descriptive terms, however, are words in the public domain that all sellers should be free to truthfully use to describe their merchandise. *Minnesota Mining & Mfg. Co. v. Johnson & Johnson*, 454 F.2d 1179, 172 U.S.P.Q. 491, 492, 59 C.C.P.A. 971 (1972). Aveda is not a word in the public domain. It was coined, as Cassidy himself claims, at a meeting in 1978 as the new name of Horst & Friends, Inc. and that corporation's products. This precisely fits the definition of a fanciful mark which is a word, either unknown or completely out of common usage, coined for the sole purpose of identifying products in the marketplace. *Blisscraft of Hollywood v. United Plastics Co.*, 294 F.2d 694, 131 U.S.P.Q. 55, 60–61 (2d Cir.1961). Fan-

ciful marks, if adopted in a bona fide first use, are considered the strongest of marks because their inherent novelty creates a substantial impact on the buyer's mind. 2 McCarthy, *Trademarks and Unfair Competition 2d* § 11:3. Therefore, Aveda should be considered a strong mark.

### 2. Extent of Similarity

The degree of resemblance necessary to create a likelihood of confusion can not be exactly defined. "It is sufficient that enough be taken to deceive the public in the purchase of a protected article." *Saxlehner v. Eisner & Mendelson Co.*, 179 U.S. 19, 33, 21 S.Ct. 7, 12, 45 L.Ed. 60 (1900).

#### a. *Phonetic Similarity*

Similarity in pronunciation may be particularly important when the goods are generally purchased by verbal request, rather than in a self-service store. *Krim–Ko Corp. v. Coca–Cola Bottling Co.*, 390 F.2d 728, 156 U.S.P.Q. 523, 526, 55 C.C.P.A. 903 (1968); *see La Maur, Inc. v. Revlon, Inc.*, 245 F.Supp. 839, 842, 146 U.S.P.Q. 654, 655 (D.Minn.1965). Deciding the issue of phonetic similarity, courts have sometimes resorted to sophisticated phonetic analysis.[5] At issue is the usual pronunciation used by the public, rather than the pronunciation claimed to be correct by the defendants. *J.B. Williams Co. v. Le Conte Cosmetics, Inc.*, 523 F.2d 187, 186 U.S.P.Q. 317 (9th Cir.1975), *cert. denied*, 424 U.S. 913, 96 S.Ct. 1110, 47 L.Ed.2d 317 (1976).

Aveda presents the affidavit of Escure and survey research in support of its claim that Avita is phonetically similar to Aveda. Escure concludes that Avita and Aveda will be pronounced similarly by the average English speaker. Escure Aff., Par. 4a. Defendants do not directly contest that conclusion. Aveda's survey research clearly documents that the words "Aveda" and "Avita" are substantially similar in pronunciation. Even with the horizontal lines added, twenty-five out of the forty people surveyed still pronounced "Avita" in a manner very similar to "Aveda." Defendants point

---

**5.** See, for example, the discussion in *G.D. Searle & Co. v. Chas. Pfizer & Co.*, 265 F.2d 385, 387, 121 U.S.P.Q. 74 (7th Cir.), *cert. denied*, 361 U.S. 819, 80 S.Ct. 64, 4 L.Ed.2d 65 (1959).

out that, even by Aveda's count, only two of the forty people surveyed pronounced "Avita" and "Aveda" exactly the same. The likelihood of confusion standard, however, does not require an infringing mark to be a phonetic duplicate, only phonetically similar. Thus, the courts have held the following marks to be confusingly similar in part on the basis of phonetic similarity: BECK'S BEER and EX BIER; COMSAT and COMSET; DIAPARENE and DYPRIN; DRAMAMINE and BONAMINE; LISTERINE and LISTOGEN; LORRAINE and LA TOURAINE; SENTOL and SENTROL; SMIRNOFF and SARNOFF. 2 McCarthy, *Trademarks and Unfair Competition 2d* § 23.6(A). The Court finds that the evidence in this case clearly does establish a confusing similarity between the pronunciation of Aveda and Avita or Āvīta.

### b. *Similarity of Appearance*

Similarity of appearance is determined "by considering the overall impression created by the mark as a whole rather than simply comparing individual features of the marks." *Exxon Corp. v. Texas Motor Exchange, Inc.*, 628 F.2d 500, 505 (5th Cir. 1980). There is little in the way of guidelines to determine the degree of visual similarity likely to cause confusion among buyers. "[A]ll one can say is 'I know it when I see it.'" 2 McCarthy, *Trademarks and Unfair Competition 2d* § 23:7.

Aveda contends that Avita products appear highly similar to Aveda products because of (1) Avita's use of a wildflower design and (2) Avita's selection of design colors. Despite Aveda's claims, the Court finds that the product packages are not confusingly similar. The wildflower on the Aveda bottle is a single stem with two flowers placed inside a small triangle which provides a dark, contrasting background. The Avita bottle presents a large rectangle with an assortment of flowers and leaves on a light background. The Court cannot assess Aveda's claim that Avita has copied the color bars which Aveda uses to distinguish each of specific product (*i.e.*, blue signifying "Blue Malva," yellow signifying "Camomile," etc.). The only evidence upon

which the Court could base such an assessment are the bottles offered by Aveda at the hearing. The Court received the bottles on the condition that Aveda later establish foundation with proof that the bottles offered were the bottles used during the relevant period. Since Aveda has not presented the required proof, the bottles will not be accepted into evidence.

### 3. Degree to which the products compete

Where products are in direct competition, the degree of similarity required to prove a likelihood of confusion will be less than in the case of noncompetitive products. *Squirtco v. Seven–Up Co.*, 628 F.2d 1086, 207 U.S.P.Q. 897 (8th Cir.1980).

The products in this case compete directly for the same select group of consumers. Both parties sell high-priced hair care products formulated to suit a variety of specific hair care needs. The products are sold primarily through salons and beauty schools after customers consult with hair dressers capable of choosing the particular product appropriate to the customer's individual needs. Defendants argue that the personal contact between the selling hair dresser and the customer makes it "inconceivable" that there would be any confusion as to the source of Avita's products. Defendants' argument is, however, undercut by the fact that EMI does not restrict sales of Avita only to salons and beauty schools. EMI allows its products to be sold in retail outlets such as grocery stores and drugstores. Cassidy Dep. at 21. The argument is also rebutted by the affidavits presented by Aveda which indicate that hair dressers, including hair dressers at salons controlled by Cassidy, have represented Avita as similar to Aveda.

### 4. Existence of an Intent to Trade on Plaintiff's Good Will

An inference of an intent to trade upon the plaintiff's good will arises if the defendants, with knowledge of plaintiff's mark, chose a mark similar to that mark from the infinite number of possible marks. *Fleischmann Distilling Corp. v. Maier Brewing Co.*, 314 F.2d 149, 136 U.S.P.Q.

508 (9th Cir.), *cert. denied,* 374 U.S. 830, 83 S.Ct. 1870, 10 L.Ed.2d 1053 (1963).

It is so easy for the honest businessman, who wishes to sell his goods upon their merits, to select from the entire material universe, which is before him, symbols, marks and coverings which by no possibility can cause confusion between his goods and those of competitors, that the courts look with suspicion upon one who, in dressing his goods for the market, approaches so near to his successful rival that the public may fail to distinguish between them.

*Florence Mfg. Co. v. J.C. Dowd & Co.,* 178 F. 73, 75 (2d Cir.1910).

Cassidy, of course, did know the Aveda mark at the time he decided to name EMI's products Avita. Cassidy claims that the Avita name was chosen for no other reason than to emphasis the vitamin enriched nature of the product. Cassidy Aff., Par. 4, 5 & 7. Aveda, on the other hand, argues that defendants have, as a marketing strategy, attempted to associate their products with Aveda products. The record supports Aveda's contention.

As established above, Avita is pronounced in a manner confusingly similar to Aveda. Avita also uses product names which mimic those used by Aveda. Avita manufactures blue malva shampoo, camomile shampoo, clover shampoo, and cherry/almond bark rejuvenating conditioner, each of which correspond to Aveda products with those exact names. Avita also makes black walnut shampoo, rosemary-mint hair rinse, flax seed gel and aloe spray-on gel which correspond to Aveda's black malva shampoo, rosemary-mint equalizer, and flax seed/aloe spray-on gel. Avita is designed to appeal to the same select group of consumers as Aveda and marketed through salons and beauty schools in a very similar fashion. Affidavits submitted by Aveda document numerous misrepresentations by sellers of Avita which seek to take advantage of Aveda's reputation in the market. These misrepresentations include statements that Avita is manufactured by the same company as Aveda, that Avita is manufactured by a "former partner" of Rechelbacher, that Avita has basically the same ingredients as Aveda, and that Avita is the same as Aveda's original formula. In the Court's opinion, the evidence clearly demonstrates an intent on the part of defendants to trade on Aveda's good will.

5. Evidence of Actual Confusion

It is the likelihood of confusion that serves as a test for infringement, not actual confusion. The plaintiff is not required to prove any instances of actual confusion. *E. Remy Martin & Co., S.A. v. Shaw–Ross International Imports, Inc.,* 756 F.2d 1525, 225 U.S.P.Q. 1131, 1134 (11th Cir. 1985); *David Sherman Corp. v. Heublein, Inc.,* 340 F.2d 377, 144 U.S.P.Q. 249 (8th Cir.1965).

Aveda claims that evidence of actual confusion is difficult to establish in this case because EMI has begun marketing Avita recently and only in a very limited area. Aveda does offer its survey evidence to prove that a substantial portion of consumers will pronounce "Avita" in a manner similar to "Aveda." That survey, while not providing evidence of actual confusion, does provide convincing evidence of the likelihood that Avita and Ᾱvita will be confused with Aveda.

C. *Conclusion*

Aveda has established a likelihood of success on the merits. First, Aveda has established that it owns a valid trademark in the Aveda name and the Aveda triangle design. Second, the evidence establishes that reasonable buyers are likely to be confused between Aveda and Avita. This conclusion is based on the fact that the standard for establishing a likelihood of confusion is not as stringent where the alleged infringer is a direct competitor of the trademark owner. It is also based on the affidavit of Escure and the survey evidence which establish that Aveda and Avita (even with the horizontal lines) will be pronounced similarly. Lastly, the conclusion is based on convincing evidence that the Avita name and marketing approach reflect an intentional effort to take advantage of the good will developed by Aveda.

## II. Irrevocable Harm

■ The second element which must be established for issuance of a preliminary injunction is irreparable injury to the moving party. In an action for trademark infringement, "the only irreparable harm the plaintiff need show is that there is a likelihood of confusion and, therefore, infringement of its mark." *Penthouse International, Ltd. v. Penthouse Party and Travel Club, Ltd.,* 184 U.S.P.Q. 479, 481 (E.D. Mich.1974); *see also, Church of Scientology Int'l v. Elmira Mission of Church of Scientology,* 794 F.2d 38, 230 U.S.P.Q. 325, 327 (2d Cir.1986).

Aveda has established a likelihood of confusion. Aveda also advances the argument that confusion could be particularly harmful in this case because Avita products are not subject to the same safeguards used by Aveda to insure that the customer is matched with the correct product. Aveda therefore foresees consumers buying an Avita product, but believing that they are using Aveda, and suffering unpleasant results because the product is wrong for them.

Defendants claim that there is no irreparable harm because there is no evidence of confusion. However, Aveda has established a likelihood of confusion and therefore shown the existence of irreparable harm.

## III. Balance of Hardships

■ The third element which must be established by a party moving for a preliminary injunction is that the harm to the moving party outweighs the financial loss and damage to the reputation of the non-moving party. *National Board of YMCA v. Flint YMCA,* 764 F.2d 199, 226 U.S.P.Q. 324, 325 (6th Cir.1985). Where the moving party has made a substantial investment developing its trademark relative to the nonmoving party's investment in the allegedly infringing mark, the courts generally find that the moving party's hardship outweighs that of the nonmoving party. *See, e.g., McNeil Laboratories, Inc. v. American Home Products Corp.,* 416 F.Supp. 804, 193 U.S.P.Q. 486, 491 (D.N.J.1976);

*Humble Oil & Refining Co. v. Humble Leasing Co.,* 146 U.S.P.Q. 717, 721 (E.D.Pa. 1965).

Avita is a new product, marketed primarily in salons owned by Cassidy in Minnesota and Iowa and in salons owned by others in the Salt Lake City, Utah area. It does not appear that defendants have expended substantial sums in the production or marketing of their product. Defendants argue conversely that a preliminary injunction would "completely disrupt" their business, leaving them without a mark and without a product on the market. This, defendants assert, would damage their relationship with customers and cause substantial replacement costs.

Aveda counters that it has expended huge sums advertising and promoting its products. Aveda further claims that a preliminary injunction will serve to avoid further expenditure by defendants in the promotion of a product bearing an infringing mark. Any hardship caused by the preliminary injunction may justly fall on the parties which consciously decided to dress their goods for the market in a manner "so near to [a] successful rival that the public may fail to distinguish between them." *Florence Mfg. Co. v. J.C. Dowd & Co.,* 178 F. 73, 75 (2d Cir.1910).

Practically speaking, the grant of a preliminary injunction may force EMI to rename its product line. If, however, the preliminary injunction is not granted Aveda will suffer a loss of trade, reputation and good will that "no final decree of a court can adequately compensate." *Carling Brewing Co. v. Philip Morris, Inc.,* 277 F.Supp. 326, 156 U.S.P.Q. 70, 77 (N.D.Ga. 1967). Given the relative size of the parties' investment and the fact that Aveda has demonstrated probable success at trial, the balance of hardships favors the issuance of injunctive relief.

## IV. Public Interest

■ The final factor considered in determining whether a preliminary injunction should issue is the public interest. In the context of trademark infringement, this factor involves balancing of the interest in

protecting the public from confusion or deception with the interest in a competitive market. 2 McCarthy, *Trademarks and Unfair Competition 2d* § 30:21. Where the moving party has demonstrated, not only that the nonmoving party's products are confusingly similar, but that misrepresentations of origin are being made in the marketplace, the public interest favors injunctive relief. *See, Council of Better Business Bureaus, Inc. v. Better Business Bureau, Inc.,* 200 U.S.P.Q. 282, 301 (S.D. Fla.1970).

Because Aveda has shown that defendants' products are being misrepresented as similar to the Aveda products, the public interest favors the requested relief.

■ Accordingly, based on the foregoing, and upon all the files, records, proceedings and arguments of counsel,

IT IS ORDERED that:

1. summary judgment is granted in favor of Aveda on defendants' counterclaim for cancellation of the registrations for Aveda's trademarks;

2. Aveda's motion for a preliminary injunction is granted;

3. defendants Evita Marketing, Inc., Harry Eugene Cassidy and Cassidy, Inc., as well as their its agents, servants, employees, successors and assigns and all persons in active concert with them, are enjoined, until further order of this Court, from using in connection with hair care products or otherwise, the name "Avita" or "A̅vita" or any name, phrase or devise colorably imitating the marks "Aveda" and "Aveda" (plus design), Registration Nos. 1229134 and 1368506, and from making any statement or representation which suggests that defendants' products or businesses are in any manner approved, sponsored, licensed, authorized, franchised by, or in any way connected or associated with plaintiff; and

4. plaintiff Aveda Corporation shall file a bond in the amount of $10,000 to secure the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. The parties may, for good cause, request that the Court increase or decrease the amount of security.