**AMERICAN DAIRY QUEEN CORPORATION**

v.

**NEW LINE PRODUCTIONS, INC.**

**No. 98–CV–1923 (JMR/FLN).**

United States District Court,
D. Minnesota.

Dec. 22, 1998.

Laura Joan Hein, Troy Athneal Bader, Ann K. Bloodhart, Gray Plant Mooty Mooty & Bennett, Minneapolis, MN, for American Dairy Queen Corporation.

Kenneth A. Liebman, Matthew S. Luxton, Faegre & Benson, Minneapolis, MN, Glen A. Rothstein, Unknown, Saul D. Brenner, Kathryn A. Young, William Grantham, Rosenfeld Meyer & Susman, Beverly Hills, CA, for New Line Productions, Inc.

## ORDER

ROSENBAUM, District Judge.

Plaintiff, American Dairy Queen Corporation ("ADQ"), seeks a preliminary injunction barring defendant, New Line Productions, Inc. ("New Line"), from using the name "Dairy Queens" as the title for one of its new movies. Both parties agree ADQ holds a valid trademark on "Dairy Queen," the name under which ADQ conducts the bulk of its retail sales. ADQ claims New Line's proposed title will infringe and dilute its valuable trademark. Plaintiff's motion is granted.

### I. *Factual Background*

New Line has produced, and is preparing to release, a new feature film, and proposes to call it "Dairy Queens." The film is described as a mock documentary (termed "mockumentary"), satirizing beauty contests in rural Minnesota, an area defendant characterizes as part of "dairy country." The movie portrays these contests as filled with

backbiting and jealousy, and suggests the participants tend to suffer from eating disorders. At least a portion of the film is acknowledged to contain off-color humor and content which may offend many—and, perhaps, entertain other—viewers.

The film is a fictive portrayal, written by a native Minnesotan, who claims to have participated in beauty contests which, at least in part, were similar to those in the movie. The movie is scheduled for release in early 1999. No part of the film's content relates, depicts, or refers in any manner to plaintiff's popular restaurants. The film's script does not refer to any kind of frozen dairy treats.

Plaintiff objects to defendant's use of a title which is very similar to its well-established "Dairy Queen" trademark. It does business through several thousand family-oriented retail outlets, selling frozen dairy treats and other food. ADQ is particularly concerned that the title "Dairy Queens" will cause the public to associate its trademarked name with the unwholesome content of the film. ADQ fears this association will create negative impressions and confuse its customers, thereby demeaning and disparaging its mark.

ADQ claims New Line's use of "Dairy Queens" constitutes both trademark infringement, under 15 U.S.C. § 1114, and trademark dilution, under 15 U.S.C. § 1125(c). An infringement claim raises issues of actual consumer confusion as to a product's or service's source; a dilution claim asserts the placement of a mark within a negative context, thus reducing its value. ADQ asks the Court to enjoin New Line from any usage which either infringes or dilutes its mark.

## II. Standard for Preliminary Injunction

 In the Eighth Circuit, the decision to grant a preliminary injunction is judged according to a four part test. The Court must consider:

1. The existence of a threat of irreparable harm to the movant;

2. The balance between that harm and any injury inflicted on the non-moving party;

3. The movant's probable success on the merits; and

4. The public interest.

See Dataphase Systems, Inc. v. CL Systems, Inc., 640 F.2d 109, 114 (8th Cir.1981). The third factor, probable success on the merits, is frequently considered the most important. See S & M Constructors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir.1992). The Court will address each Dataphase factor in turn. When the factors apply differently to the infringement and the dilution claims, they are addressed separately.

### A. Threat of Irreparable Harm

 As noted, plaintiff claims both traditional trademark infringement, under 15 U.S.C. § 1114, and violation of the newer right to protection from trademark dilution, under 15 U.S.C. § 1125(c). When considering traditional trademark infringement, irreparable harm may be presumed "from a finding of probable success in proving likelihood of confusion." Calvin Klein Cosmetics Corp. v. Lenox Laboratories, Inc., 815 F.2d 500, 505 (8th Cir.1987). This contrasts with trademark dilution, which does not require a likelihood of confusion. For trademark dilution, proof of a likelihood of dilution of a mark will support a presumption of irreparable harm. See Toys "R" Us, Inc. v. Akkaoui, 1996 WL 772709, 40 U.S.P.Q. 1836, 1838–39 (N.D.Cal.1996). The Court finds that plaintiff has shown a threat of irreparable harm under both theories.

The "Dairy Queen" mark was first used and applied to frozen dairy treats in 1940. It was registered and granted trademark protection in 1963. ADQ's familiar sign—which presents only its trademarked name—is a frequent, well-recognized presence all along the streets and highways of the midpart of the United States. The mark is well-represented all over the nation. When the decades of effort expended in establishing a mark of the quality of "Dairy Queen" are considered, it is clear that the enormous goodwill created possessed by ADQ and represented by its "Dairy Queen" mark could be greatly diminished by a harmful usage. The Court concludes that ADQ has established a threat of irreparable harm.

## B. *Balance of the Harm to Plaintiff Against the Injury to Defendant*

The plaintiff posits a grave risk to its well-known mark if defendant's proposed title is placed in the public's consciousness. This contrasts with the highly conjectural harm defendant asserts if it is forced to choose a different title for its film. Plaintiff, as seen above, has spent decades establishing its mark as the recognizable sign of a wholesome, family-oriented restaurant. Defendant, on the other hand, will simply have to retitle a film for which it has engaged in virtually no marketing to date. Although the Court cannot gainsay defendant's protestations of its difficulty in conceiving a new and original title, this factor favors plaintiff.

## C. *Probable Success on the Merits*

Because the theories under which plaintiff seeks relief are distinct, the likelihood of success on each will be addressed separately.

### 1. *Infringement Theory*

Use of a protected mark is prohibited when a competing use is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114. Likelihood of confusion is a question of fact. *See Calvin Klein Cosmetics Corp.*, 815 F.2d at 504. The question is to be resolved by considering a number of factors, commonly referred to as the "digits of confusion." None is dispositive. Among the digits of confusion are:

### a. *Strength of the Infringed Mark*

■ Two factors measure a mark's strength: "the distinctiveness of the mark and the extent to which the mark is recognized by the relevant consumer class." *Aveda Corp. v. Evita Marketing, Inc.*, 706 F.Supp. 1419, 1428 (D.Minn.1989). The Court easily finds ADQ possesses a very strong mark in "Dairy Queen," at least insofar as it relates to soft-serve dairy products. An arbitrary or fanciful mark is considered stronger than a mark which is merely descriptive. *See Insty*Bit, Inc. v. Poly–Tech Industries, Inc.*, 95 F.3d 663, 672 (8th Cir. 1996). Despite New Line's suggestion that ADQ's "Dairy Queen" mark is descriptive, the Court does not find it to be. Consider:

ADQ's stores do not sell "queens." ADQ's stores sell soft serve treats and snacks. Its "Dairy Queen" name, then, does not describe the product it sells, except insofar as ADQ's products are frequently milk-based. New Line's proposed movie title, on the other hand, is purely descriptive; the film is about beauty contest royalty in what New Line's brief calls "dairy country." New Line's contestants are, according to New Line's lights, "Dairy Queens." When viewed in this light, ADQ's mark—being fanciful—is accorded a greater degree of protection, and New Line's—being descriptive—is afforded a lesser. ADQ's mark is distinctive and instantly recognized by millions of consumers. Based on these facts, the Court concludes ADQ's mark is strong. This determination militates in favor of a finding of a likelihood of confusion.

### b. *Similarity of the Marks*

■ New Line has not offered a rendition of the graphic which will portray its proposed "Dairy Queens" title. New Line assures the Court, however, that it will not be framed in a red-colored modified oval shape, as ADQ's mark is typically presented. Even assuming that New Line's title does not directly resemble ADQ's familiar "Dairy Queen" within its stylized red oval, this does not resolve the question of the similarity of the marks. "The degree of resemblance necessary to create a likelihood of confusion cannot be exactly defined." *Id.* at 1428. "Similarity of the marks is tested on three levels: sight, sound, and meaning.... Each must be considered as they are encountered in the marketplace." *AMF Inc. v. Sleekcraft Boats,* 599 F.2d 341, 351 (9th Cir.1979).

On the most simplistic level, the Court sees that "Dairy Queens" and "Dairy Queen" are identical—save and except the single letter "s" which makes New Line's term plural. Their respective sounds are almost identical, and they look almost identical. The additional "s" does not suffice to differentiate the marks; the Court easily recalls taking its children for "Dairy Queens" on a warm summer's evening. The competing mark's "meaning," the third factor of similarity, appears to be somewhat different in New

Line's projected title. The difference does not arise from New Line's added "s" however; it simply arises from additional information which can be gleaned about the content of the film from its surroundings—advertising, reviews, and so on.

Defendant avers its title will appear "very different" in the marketplace. In the absence of material which can be evaluated, New Line indicates its marketing efforts will employ a logo differentiating it from ADQ's. It further asserts its film advertising will make clear the film is not about plaintiff's products or restaurants. They suggest the addition of the film studio's name will further emphasize the different nature of its proposed title. The Court considers these contentions to be highly conjectural, particularly in the absence of any competent evidence. New Line has also indicated it is willing to explore the possibility of a disclaimer, which will explicitly differentiate its proposed title from ADQ's mark. It does not appear, however, that this proposal has been accepted by the plaintiff.

One reason why ADQ appears to be unwilling to accept New Line's proposed disclaimer is ADQ's view that no disclaimer can resolve a problem which occurs in the real world. ADQ claims, and there is no evidence which counters the suggestion, that the facile use of a palliative disclaimer misapprehends the way the public actually learns of films in the public marketplace. The Court recognizes that the public often hears of a film by the "buzz." The buzz is a kind of word-of-mouth process. It may involve guest or film star appearances on television programs, it may be through radio programs or newspaper or gossip columnists, it may involve early web "reviews," or chance conversations. In such contexts, even the best efforts to append a distinguishing disclaimer would be of no account. The buzz goes far beyond the reach of a printed disclaimer.

The Court acknowledges that, in some contexts, it is conceivable that even nearly identical words can be deemed dissimilar. *See Life Technologies, Inc. v. Gibbco Scientific, Inc.,* 230 U.S.P.Q. 779 (D.Minn.1986) (finding solely aural similarity between "Gibbco" and "Gibco"). But this is not such a context. The Court finds, as a matter of fact, that there is a significant similarity between ADQ's trademark and the proposed New Line title. This factor militates in favor of a finding of likelihood of confusion.

c. *Degree to Which the Products or Services Compete*

 "Where products are in direct competition, the degree of similarity required to prove a likelihood of confusion will be less than in the case of noncompetitive products." *Aveda,* 706 F.Supp. at 1429. However, a lack of direct competition does not preclude a finding of likelihood of confusion. *Cf. Anheuser–Busch, Inc. v. Balducci Publications,* 28 F.3d 769 (8th Cir.1994) (finding infringement where an artistic rendition of a magazine advertisement parodied a beer trademark).

Certainly, ADQ does not make films, and New Line sells neither soft serve treats nor snack foods.[1] At the same time, the Court recognizes that product cross-licensing is on the rise,[2] but this does not suggest that a consumer is likely to view the litigants' products as competitive. Therefore, the Court finds this factor militates against a finding of likelihood of confusion.

d. *Existence of an Intent to Trade on Mark's Goodwill*

 "An inference of an intent to trade upon the plaintiff's good will arises if the defendant[ ], with knowledge of plaintiff's mark, chose a mark similar to that mark from the infinite number of possible marks." *Aveda,* 706 F.Supp. at 1429 (citing *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149 (9th Cir.1963)). Here, New Line is well aware of ADQ's mark and knew of its existence when it chose "Dairy Queens"

1. The Court does not consider movie theater snack bar foods as competition for ADQ's products in this context.

2. "Cross-licensing" occurs when a movie offers tie-ins with other commercial products. Recent examples include portable telephones and automobiles in "James Bond" films. It is frequently seen with major fast food vendors and dealers in consumer goods.

as the film's title. New Line's professed willingness to append disclaimers to its marketing materials suggests its intent is not direct competition or misappropriation of goodwill. On the other hand, this claimed willingness has not resulted in an agreement to resolve this matter. On balance, the Court cannot find clear evidence of intent to trade on ADQ's goodwill.

### e. Evidence of Actual Confusion

■■■ Although evidence of actual confusion is useful and persuasive in typical infringement cases, it is important to remember "it is the *likelihood* of confusion that serves as a test for infringement, not actual confusion. This is especially so where the allegedly infringing item has not been advertised or released. In such a case, the plaintiff is not required to prove any instances of actual confusion." *Aveda,* 706 F.Supp. at 1430 (citing *David Sherman Corp. v. Heublein, Inc.,* 340 F.2d 377 (8th Cir.1965)) (emphasis added).

Under these circumstances, where the allegedly infringing mark has not been made public, there can be little evidence of direct consumer confusion. Accordingly, this factor is neutral in the Court's determination.

Taking, then, all of the elements of infringement together, the Court finds ADQ has established a probability of success on the merits of its trademark infringement claim. It is probable that consumers would be confused as to the source of a film called "Dairy Queens," or would, at least, conclude that New Line had received endorsement or permission of ADQ for use of its mark.[3] Thus, the third *Dataphase* factor, likelihood of success on the merits, favors ADQ's request as to its infringement claim.

### 2. Dilution Claim

■■■ Owners of "famous" marks are entitled to injunctive relief if another's commercial use of the mark "causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c). Dilution claims do not turn on the likelihood of consumer confusion. *See*

*Minnesota Mining & Manufacturing Co. v. Rauh Rubber, Inc.,* 943 F.Supp. 1117, 1131 (D.Minn.1996), *aff'd,* 130 F.3d 1305 (8th Cir. 1997). This is because "dilution is a 'weakening or reduction in the ability of a mark to classify and unmistakably distinguish one source.'" *Rauh Rubber,* 943 F.Supp. at 1131 (quoting 3 McCarthy, Trademarks and Unfair Competition § 24.13[1][a] ). In order to establish a claim of trademark dilution, four elements must be established. Each is considered below.

### a. Famousness of the Mark

Numerous factors determine whether a mark is famous. *See Toys "R" Us,* 1996 WL 772709, 40 U.S.P.Q.2d at 1838. They need not be reviewed here, however, because defendant acknowledges ADQ's marks as famous. The Court easily finds "Dairy Queen" is a famous mark.

### b. Commercial Use of ADQ's Mark in Commerce

The Dilution Act, by its terms, exempts noncommercial use from its regulation. *See* 15 U.S.C. § 1125(c)(4)(B). New Line contends that, because its proposed film name is the title of an artistic work, its use is noncommercial. From this proposition, New Line simply denies the Dilution Act applies to this dispute. ADQ replies that the film's content might well be noncommercial, but its title has a highly commercial aspect.

The Court finds New Line's proposed title is not being used primarily as part of an expressive work, but instead is used "to market, advertise or identify" the film. *Mutual of Omaha,* 836 F.2d at 402; *see also Defendant's Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction* at 4 ("Titles are critical in successfully marketing motion pictures."). The potentially expressive content of New Line's proposed title is discussed below, but the Court takes New Line at its own words, and finds its proposed title is predominantly commercial and marketing-oriented. As a result, the Court finds the Dilution Act applies to defendant's use.

---

**3.** New Line advances a First Amendment defense to both of plaintiff's claims. Because the analy-

sis for each is identical, the defense will be addressed at the end of the Order.

c. *Use of the Mark After it Became Famous*

No one denies defendant's proposed use of the phrase "Dairy Queens" began years after plaintiff's decades-old trademark became famous.

d. *Dilution of the Quality of the Mark by Diminishing the Capacity of the Mark to Identify Goods and Services*

Plaintiff alleges trademark "tarnishment," which occurs when "unauthorized use ... tarnishes, degrades, or dilutes the mark's distinctive quality." *Rauh Rubber*, 943 F.Supp. at 1131–32. While tarnishment most frequently occurs when a mark is used in connection with sexually explicit materials, *see, e.g., Toys "R" Us*, 1996 WL 772709, 40 U.S.P.Q.2d at 1838, other negative associations can also constitute tarnishment. *See, e.g., Anheuser–Busch Inc. v. Andy's Sportswear Inc.*, 40 U.S.P.Q.2d at 1542 (N.D.Cal. 1996) (finding tarnishment by "Buttwiser" t-shirts resembling "Budweiser" beer advertising); *Coca–Cola Co. v. Alma–Leo U.S.A., Inc.*, 719 F.Supp. 725, 728 (N.D.Ill.1989) (finding tarnishment by "Enjoy Cocaine" poster in style of "Enjoy Coca–Cola" design).

Here, defendant does not deny that some viewers may consider certain portions of its film to be offensive, even if others find it humorous. It is likely that some of the film's advertising materials will allude to at least some of these offensive portions. This could well place plaintiff's mark in close proximity to offensive materials, even without an ADQ customer setting foot in a theater. Beyond any conjectures concerning New Line's film marketing, however, if the name "Dairy Queens" is affixed to the film, word-of-mouth, critical comment, or news articles will inevitably lay the film's content next to ADQ's trademarked name. This will occur regardless of the artistry or disclaimers applied to the film's visual, broadcast, or other advertising. The Court concludes that conjoining New Line's film with the "Dairy Queen" mark, evoking as it does a family-friendly soft-serve ice cream restaurant, satisfies this fourth element of ADQ's dilution claim.

When the elements of trademark dilution are considered together, the Court concludes that plaintiff has established a likelihood of success on the merits of its trademark dilution claim.

Thus, plaintiff has established the third *Dataphase* factor, likelihood of success on the merits, as to both its infringement and dilution claims.

D. *Public Interest*

The final element considered in an application for a preliminary injunction is the public interest. Here, the public interest is manifest. The Congress, the branch of government closest to the public, has passed the Trademark Act and recently amended it. It has clearly expressed its support for, and the public's interest in, trademark protection. Infringement and dilution of trademarks are inherently contrary to the public interest. *See Coca–Cola Co.*, 719 F.Supp. at 730. Accordingly, this factor favors the grant of a preliminary injunction.

After considering the four *Dataphase* factors, the Court concludes the grant of a preliminary injunction is warranted. There remains, however, defendant's claim that the First Amendment trumps both claims, ultimately barring ADQ's requested relief.

III. *The First Amendment*

This dispute's constitutional and intellectual issues are significant. The case asks whether the film's expressive content—surely protected by the First Amendment—is embodied in its content, or its title, or both. Importantly, ADQ does not challenge, nor does it ask the Court to consider, a single word of the film's script; it does not seek to modify a line. Rather, ADQ's only concern is with the title "Dairy Queens." There is no effort of any kind to modify or muzzle New Line's views or expressions concerning the midwest beauty contests, "dairy country," or the film's asserted objectionable sexual, racial, or religious content. ADQ simply wants to keep the public from developing the sense that it is a sponsor or endorser of New Line's film, or has voluntarily lent its name to it. The Court considers the limited nature of the requested relief to be significant.

The Court observes that the Eighth Circuit, after carefully balancing the conflicting interests, has allowed injunctive relief—even when the enjoined material included some expressive content. *See, e.g., Mutual of Omaha Ins. Co. v. Novak,* 836 F.2d 397 (8th Cir.1987); *Anheuser–Busch v. Balducci Publications,* 28 F.3d 769 (8th Cir.1994). The question, then, is when First Amendment interests are sufficient to outweigh the interests supporting the issuance of an injunction.

The Eighth Circuit has framed the applicable standard in two different, yet consistent, ways. In *Mutual of Omaha,* Judge (now Chief Judge) Bowman focused on whether an injunction "leaves open [alternative] avenues of expression," thus "depriv[ing] neither [the defendant] nor the public of the benefit of his ideas." *Mutual of Omaha,* 836 F.2d at 402. There, the defendant had been selling "Mutant of Omaha" paraphernalia bearing a logo very similar to the plaintiff's mark. The Court noted that the injunction would not prevent defendant from presenting "an editorial parody in a book, magazine, or film." *Id.* Because defendant had alternative avenues available for expressing his public policy views, the narrowly-drawn injunction was consistent with the First Amendment.

The Eighth Circuit revisited the question in *Balducci,* with Judge Bowman a member of the panel. In *Balducci,* the Court framed a balancing test: "[I]n any case where an expressive work is alleged to infringe a trademark, it is appropriate to weigh the public interest in free expression against the public interest in avoiding consumer confusion. . . . This approach takes into account the ultimate test in trademark law, namely, the likelihood of confusion as to the source of the goods in question." *Balducci,* 28 F.3d at 776 (quoting *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group,* 886 F.2d 490, 494–95 (2d Cir.1989)). In both *Mutual of Omaha* and *Balducci,* the Eighth Circuit affirmed the issuance of an injunction.

Despite defendant's protests to the contrary, the Court concludes that alternative avenues are available for expressing New Line's ideas. New Line claims its proposed title is expressive, and the author cannot convey her ideas behind the film without using the name "Dairy Queens." In support, New Line offers the author's affidavit declaring she is unsatisfied with any other title. It is not for this Court to name films, but it appears she has rejected ideas such as "Dairy Princesses," "Milk Maids," or any other formulation, except that single title which touches ADQ's mark.

New Line emphatically denies any reference to plaintiff's company or restaurants in its use of the proposed title. This denial, however, actually weakens its argument that there are no alternative means to express its artistic impressions or ideas. This case is not like *Rogers v. Grimaldi,* 875 F.2d 994 (2d Cir.1989), which also involved a movie title. In *Rogers,* Ginger Rogers (half of the immortal dance and film team of Ginger Rogers and Fred Astaire) claimed a film's title infringed upon and diluted the trademarked "Ginger Rogers Hosiery" she was selling. Judge Newman, writing for the Second Circuit, ruled that it did not—but he carefully noted the film's director, Frederico Fellini, averred that he selected the film's name intending to evoke the aura of "Fred and Ginger's" artistic expression. Fellini was referring directly to Fred Astaire and Ginger Rogers. This reference was essential to his filmic vision.

This markedly contrasts with New Line's position. New Line is explicit: there is nothing in its use of the "Dairy Queens" name designed to evoke or even suggest any relationship at all to ADQ's trademarked name or any of its products. *See Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction* at 5 ("The Film's title is not intended to in any way suggest, refer to or cause confusion with Plaintiff, or capitalize on any goodwill of Plaintiff.").

The Court considers the distinction to be crucial. In *Rogers,* the name did express, and was designed to evoke, a part of the artistic concept inhering in the famous names it used. In the present case, no such artistic concept inheres in the proposed title. As such, the argument that there is no other way to express the idea of the film's title carries much less weight, as the idea expressed is not a reference to plaintiff's mark. Absent such relevance, the Court concludes

that alternative avenues for expressing the idea exist.

On these facts, and noting the somewhat lesser protection afforded commercial speech, *see Central Hudson Gas & Electric Corp. v. Public Service Comm'n,* 447 U.S. 557, 562–63, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), the Court concludes the balance between the public's interest in free expression and its interest in avoiding consumer confusion and trademark dilution tilts in favors of avoiding confusion and dilution. An injunction here will only effect a minute restriction on expression, but will do much to avoid confusion and dilution. Defendant's First Amendment interests are fully protected.

IV. *Conclusion*

Accordingly, IT IS ORDERED that:

1. Defendant is preliminarily enjoined from reproducing, copying, colorably imitating, or otherwise using ADQ's trademark "Dairy Queen," or any other term or mark confusingly similar thereto, specifically including its proposed "Dairy Queens" film name.

2. This injunction is effective upon the date this Order is signed, and shall terminate on December 31, 1998, unless the plaintiff places a bond with the Clerk of this Court, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, in the penal sum of $25,-000, on or before that date.