MINNESOTA MINING AND MANUFAC-
TURING COMPANY, Plaintiff,

v.

RAUH RUBBER, INC., GAIA Enterpris-
es, Inc., Joseph Rauh, James T. Rauh
and James Thomas, Defendants.

Civil No. 4–96–202.

United States District Court,
D. Minnesota,
Fourth Division.

Oct. 17, 1996.

Ronald J. Schutz, Rita Coyle DeMeules, Robins Kaplan Miller & Ciresi, Minneapolis, MN, Bradley C. Sweet, Joseph Henry Otterstetter, St. Paul, MN, for Minnesota Mining and Manufacturing Company.

Stephen J. Snyder, Darron C. Knutson, Thomas H. Boyd, Winthrop & Weinstine, St. Paul, MN, David P. Bertsch, Buckingham Doolittle & Burroughs, Akron, OH, for Rauh Rubber, Inc., GAIA Enterprises Inc., Joseph Rauh, James T. Rauh, and James Thomas.

## ORDER ON DEFENDANTS' MOTIONS TO DISMISS AND PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

TUNHEIM, District Judge.

Plaintiff Minnesota Mining & Manufacturing Co. ("3M") filed a complaint on March 3, 1996, against defendants Rauh Rubber, Inc. ("Rauh Rubber"), GAIA Enterprises, Inc. ("GAIA"), and two principals of both corporations, James Rauh and Joseph Rauh, in connection with the resale of 3M trademarked reflective materials 3M scrapped and sold to Rauh Rubber. 3M contends that the materials were sold to Rauh Rubber with the express understanding that they were to be used exclusively for recycling into rubber products and would not be used for their intended purpose. 3M alleges that Rauh Rubber violated this agreement by offering the materials for sale to 3M customers for their intended use. 3M's eight-count complaint alleges that Rauh Rubber's actions constitute trademark infringement, trademark dilution, breach of contract, and deceptive trade practices.

On March 8, 1996, following briefing and a hearing at which both plaintiff and defendants appeared, the Court entered a temporary restraining order prohibiting Rauh Rubber from offering the 3M reflective materials for sale. Defendants subsequently moved the Court to dissolve the temporary restraining order; the Court denied defendants' motion to dissolve on May 6, 1996. Defendants also moved to dismiss the complaint against James Rauh and Joseph Rauh pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction over James and Joseph Rauh and to dismiss the complaint in its entirety for improper venue pursuant to Fed.R.Civ.P. 12(b)(3). The Court heard argument on the motion to dismiss on April 19, 1996. The Court subsequently heard four days of testimony and argument with respect to 3M's motion for a preliminary injunction. The Court took under advisement both defendants' motion to dismiss and plaintiff's motion for a preliminary injunction.

For the following reasons, the Court denies defendants' motion as to James Rauh; grants defendants' motion as to Joseph Rauh; and grants plaintiff's motion for a preliminary injunction as detailed below.

## I. MOTIONS TO DISMISS

### A. Personal Jurisdiction Over Out–of–State Individual Defendants

When a party challenges personal jurisdiction in a motion under Rule 12(b)(2), the plaintiff must ultimately prove personal jurisdiction by a preponderance of the evidence. *Dakota Industries v. Dakota Sportswear*, 946 F.2d 1384, 1387 (8th Cir.1991). The burden of proof is on the party seeking to establish personal jurisdiction over the defendant; the burden of proof does not shift to the party challenging jurisdiction in a motion to dismiss for lack of jurisdiction over the person. *Gould v. P.T. Krakatau Steel*, 957 F.2d 573, 575 (8th Cir.1992). Prior to trial, only a prima facie showing is necessary. *Hardrives, Inc. v. City of LaCrosse*, 307 Minn. 290, 240 N.W.2d 814, 816 (1976).

The assertion of personal jurisdiction requires that the defendant be within reach of the applicable state long-arm statute and that the exercise of jurisdiction be consistent with the due process clause of the Fourteenth Amendment. *Northrup King v. Compania Productora Semillas*, 51 F.3d 1383, 1387 (8th Cir.1995). Plaintiff alleges that defendants transacted business in Minnesota and committed acts causing injury in Minnesota and therefore are within the reach of Minnesota's long-arm statute. *See* Minn.Stat. § 543.19, subd. 1(b)–(d). Minnesota courts interpret Minn.Stat. § 543.19 to reach as far as the Constitution allows; thus, if a court's assertion of jurisdiction is consistent with the due process clause of the federal constitution, the long-arm statute's requirements will also be met. *Id.* (citing *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 410 (Minn.1992)). The issue before the Court is therefore whether the assertion of jurisdiction in this case is consistent with the defendants' federal due process rights.

Under the due process clause, jurisdiction over a nonresident requires that the defendant have such minimum contacts with the forum state that the maintenance of a suit does not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Minimum contacts are sufficient if the defendant purposefully avails himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws. *Burger King v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 2183–84, 85 L.Ed.2d 528 (1985). This test is met if a defendant has deliberately engaged in activities within a state or created continuing obligations between a litigant and residents of the forum, and such actions invoke the benefits and protection of a state's laws. *Id.* at 475–76, 105 S.Ct. at 2183–84. For personal jurisdiction to exist, there must be a relationship between the defendant, the forum, and the litigation. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984).

Due process analysis also distinguishes between "general" and "specific" personal jurisdiction. A defendant is subject to general jurisdiction in the forum state if it conducts

business in a continuous and systematic manner such that it becomes subject to the jurisdiction of the forum for any purpose, including those unrelated to the defendant's contacts with the forum. For specific jurisdiction over a defendant with minimum contacts with the forum, the due process clause requires that the case "arise out of or be related to" those contacts. *Helicopteros Nacionales,* 466 U.S. at 414, 104 S.Ct. at 1872; *Valspar,* 495 N.W.2d at 408.

Purposeful contacts with a forum state must be considered in light of five factors to determine whether the assertion of personal jurisdiction comports with fair play and substantial justice. *Minnesota Mining & Mfg. v. Nippon Carbide Ind.,* 63 F.3d 694, 697 (8th Cir.1995); *Northrup King* at 1387–88. The three primary factors are the nature and quality of defendant's contacts with the forum state, the quantity of contacts, and the source and connection of the cause of action with those contacts. *Id.* at 1388. Two secondary factors are the interest of the forum state in providing a forum for its residents, and the convenience of the parties. *Id.* In determining whether the contacts are sufficient, a court must consider all of a defendant's contacts with the forum in the aggregate and examine the totality of the circumstances. *Id.* The five-factor test is another way of asking whether the defendant has established enough contacts with Minnesota to justify being sued here and whether those contacts were established on purpose in order to conduct business in this state. *Real Properties, Inc. v. Mission Ins. Co.,* 427 N.W.2d 665, 668 (Minn.1988).

 The defendants moving for dismissal for lack of personal jurisdiction in this case are individuals who are principals of the defendant corporations. The Complaint alleges that James and Joseph Rauh infringed and diluted 3M's trademarks, committed fraud, and engaged in deceptive trade practices. Corporate officers or employees alleged to have committed intentional torts in the course of their employment are not insulated from personal jurisdiction by their status as officers or employees. *Calder v. Jones,* 465 U.S. 783, 789–90, 104 S.Ct. 1482, 1486–88, 79 L.Ed.2d 804 (1984); *Keeton v. Hustler Mag-*

*azine,* 465 U.S. 770, 781, 104 S.Ct. 1473, 1481–82, 79 L.Ed.2d 790 (1984). Officers or employees' contacts with a forum state are not to be judged according to the corporation's activities there; rather, each defendant's contacts with the forum state must be assessed individually. *Calder,* 465 U.S. at 790, 104 S.Ct. at 1487–88; *Keeton,* 465 U.S. at 781, 104 S.Ct. at 1481–82.

The facts pertinent to this motion concern the relationship between James and Joseph Rauh, Minnesota, and the causes of action. On this motion to dismiss, the Court views the admissible facts in the light most favorable to 3M, resolving all conflicts of allegations and drawing all reasonable inferences in its favor. *Northrup King v. Compania Productora Semillas,* 51 F.3d 1383, 1385 (8th Cir.1995). The following facts, for purposes of deciding this motion only, present the allegations in the light most favorable to 3M.

3M is a Delaware corporation and manufacturer of industrial, commercial, residential and office products with its principal place of business in St. Paul, Minnesota. Rauh Rubber, Inc. is an Ohio corporation which purchases scrap materials for resale or recycling with a principal place of business in Akron, Ohio. Defendant Joseph Rauh is President of Rauh Rubber and a 40% shareholder. Defendant James Rauh is Vice–President of Rauh Rubber and is also a 40% shareholder. James and Joseph Rauh are also officers and 40% shareholders of defendant GAIA.

The facts viewed in the light most favorable to 3M establish that Rauh Rubber has engaged in a long-term business relationship with 3M's Minnesota headquarters which led to the transactions at issue in this case. James Rauh first visited Minnesota in 1989 to discuss selling rubber products to 3M. While in Minnesota, Rauh met Jack Lavold, a 3M employee responsible for selling scrap materials. 3M subsequently began selling Rauh Rubber scrap materials from various 3M plants around the country. During a four-year period between 1989 and 1994, 3M sold over 4 million pounds of scrap material to Rauh Rubber, including some materials from 3M's plant in Hutchinson, Minnesota.

This ongoing relationship involved further direct contacts with 3M in Minnesota.

Throughout the relationship, 3M sent scrap materials with invoices issued in St. Paul which required payment to 3M in St. Paul. In 1991, James and Joseph Rauh came to Minnesota to attend a meeting in St. Paul with 3M employees regarding Rauh Rubber's legal difficulties with the state of Ohio in environmental compliance. Also in 1991, James Rauh entered into a Disclosure Agreement with 3M Minnesota which governed information obtained as a result of collection and accumulation of scrap for salvage. In October 1993, Jack Lavold sent James Rauh a letter from 3M headquarters in Minnesota concerning the terms of 3M's sales of scrap to Rauh Rubber.[1] James Rauh also visited Minnesota in October, 1994 to attend a 3M used equipment sale in St. Paul, Minnesota.

In September 1993, 3M began selling Rauh Rubber scrap reflective materials from its Brownwood, Texas plant. Rauh Rubber purchased approximately 677,000 pounds of this scrap reflective material, the material at issue in this lawsuit. The sales to Rauh Rubber were negotiated by 3M employees in Texas. The invoices which accompanied the materials sold to Rauh Rubber were generated by 3M in Texas and required payment to 3M in Minnesota. After the dispute which led to this lawsuit began, in autumn of 1994, James Rauh attended a meeting in St. Paul seeking to reestablish Rauh Rubber's business relationship with 3M.

James Rauh also attempted to sell the materials at issue in this lawsuit in Minnesota, and did sell such material to one Minnesota customer. James Rauh, using either his own name or the name James Thomas, contacted three Minnesota customers of 3M with offers to sell reflective material. James Rauh made the offers on behalf of GAIA, a corporation closely related to Rauh Rubber and also a defendant in this case. James Rauh used trademarked names and 3M's product numbers and sent samples of reflective materials marked with 3M's trademarks to these Minnesota customers. James Rauh, using the name James Thomas on behalf of defendant GAIA, sold scrap reflective mate-

rial, Scotchlite 8930, to a company located in St. Paul, Minnesota.

According to James Rauh's deposition testimony, Joseph Rauh consults with James Rauh on management of Rauh Rubber and helps in the organization of the warehouse. Joseph Rauh has participated in two sales on behalf of Rauh Rubber; neither sale involved contacts with Minnesota. 3M's Complaint alleges that Joseph Rauh has decision making responsibility and authority for Rauh Rubber and that he has been personally involved in the events described in the Complaint.

### 1. James Rauh

■ There is evidence that James Rauh engaged in a course of dealing with plaintiff in Minnesota which established an ongoing business relationship between his company and 3M. James Rauh made at least four trips to Minnesota to meet with 3M employees in furtherance of that business relationship. He purchased a significant amount of materials from 3M, some of which came from a Minnesota plant. He negotiated many of these sales with 3M personnel in Minnesota. He received a letter from 3M in Minnesota purporting to state the terms for all sales of scrap 3M materials to Rauh Rubber and continued to accept materials after receiving the letter. He entered into a disclosure agreement with 3M in Minnesota which the parties appear to agree governed the materials at issue in this case. James Rauh also met in Minnesota with 3M personnel regarding the dispute which is now the subject of this lawsuit. Finally, James Rauh solicited Minnesota consumers of reflective materials and sold 3M trademarked materials to a Minnesota company.

Plaintiff does not allege that James Rauh's connections with Minnesota are of sufficient quantity and quality as to subject him to jurisdiction of the courts with respect to matters unrelated to the contacts. The Court therefore must determine whether the contacts alleged are sufficiently related to the cause of action to support the exercise of specific jurisdiction over James Rauh.

1. The parties dispute whether this agreement covered the transactions at issue in this case.

For purposes of the motion to dismiss, the Court must assume that it did.

Some of the contacts alleged by plaintiff, such as James Rauh's visits to Minnesota for used equipment sales, do not relate to the cause of action. Defendant argues that only contacts relating to the sale of the reflective materials at issue in the lawsuit are sufficiently related, and that these contacts were all with 3M personnel in Texas. Defendant's view of the relatedness of James Rauh's contacts, however, is overly narrow and ignores Minnesota contacts which were directly related to the sale of reflective materials. Plaintiff's cause of action generally "arose out of" Rauh's initial contacts and ongoing business relationship with 3M in Minnesota. *See Northrup King,* 51 F.3d at 1389 (fostering continuation of business relationship is purposeful availment by conducting activities within Minnesota). In addition, Rauh's receipt of a letter sent from Minnesota which contained the terms of 3M's scrap sales to his company, entering into a disclosure agreement with 3M Minnesota, and his travel to Minnesota to attempt to reestablish his business relationship with 3M after the breakdown in the relationship over the reflective materials at issue in this case are further connections with the forum state which are related to the transactions which led to this lawsuit.

James Rauh also allegedly infringed on 3M's trademarks through solicitation of and sales to Minnesota customers. These contacts alone are sufficient to support this Court's jurisdiction. The shipment of articles into a state for resale, when it is alleged that the articles bear infringing trademarks, is generally regarded as the commission of a tortious act within a state. 4 *McCarthy on Trademarks and Unfair Competition* § 32.14[a]. Consumer confusion within the state causes tortious injury in the state to the trademark owner. *Id.; Keds Corp. v. Renee Int'l Trading Corp.,* 888 F.2d 215 (1st Cir. 1989). 3M in this case has alleged that Rauh's sales to Minnesota customers infringed 3M's trademarks.[2]

In determining whether James Rauh's contacts with Minnesota are sufficient, this Court must consider all of his contacts in the aggregate and examine the totality of the circumstances. *Nippon,* 63 F.3d at 697. The infringement in Minnesota allegedly caused by James Rauh, together with James Rauh's earlier and subsequent related business contacts with 3M in Minnesota, are sufficient contacts to support the exercise of this Court's jurisdiction. Defendant James Rauh has deliberately engaged in activities within Minnesota which invoked the benefits and protection of Minnesota's laws. *Burger King,* 471 U.S. at 475–76, 105 S.Ct. at 2183–84. His contacts were not "random" "isolated" or "fortuitous." *See Northrup King,* 51 F.3d at 1388 (citing *Keeton* ). James Rauh established enough deliberate contacts with Minnesota in order to conduct business in this state to justify being sued here. *See Real Properties,* 427 N.W.2d at 668. As to secondary factors, Minnesota has an interest in providing a forum for citizens claiming that their trademarks were infringed in the state. Because the transactions at issue occurred in three states, and the infringement occurred in multiple states, the witnesses are located in many states and the convenience of the parties does not weigh heavily in favor of either party.

### 2. Joseph Rauh

■ Plaintiff's Complaint and affidavits in support of its argument that this Court has jurisdiction over defendants contain a paucity of allegations regarding Joseph Rauh. The only facts which may be gleaned from the record are a general assertion that Joseph Rauh has decision making responsibility and authority for Rauh Rubber and "has been personally involved in the events described in the Complaint;" that James Rauh consults him on management of Rauh Rubber; that he assists with organization of Rauh Rubber's warehouse; that he attended a meeting

---

**2.** It is of no import that Rauh made sales to customers in several other states as well. *See, e.g., A. Uberti & C. v. Leonardo,* 181 Ariz. 565, 892 P.2d 1354, 1362, *cert. denied,* —— U.S. ——, 116 S.Ct. 273, 133 L.Ed.2d 194 (1995) (If selling through a national distributor insulated defendant from the jurisdiction of individual states,

"then no individual state could assert jurisdiction over defendant simply because defendant did not target a particular state or group of states but instead intended to sell its product to all of America. [This] argument turns common sense on its head.").

in St. Paul, Minnesota in 1991 regarding Rauh Rubber's environmental compliance; and that he participated in two sales of reflective materials on behalf of Rauh Rubber, neither of which involved contact with Minnesota.

These allegations are insufficient to demonstrate that Joseph Rauh has purposefully availed himself of the privilege of conducting activities within Minnesota or that he caused injury in Minnesota. There are no allegations that Joseph Rauh personally supervised or directed any of the specific activities alleged to have caused injury in Minnesota. There are no allegations that Joseph Rauh had contacts with Minnesota which relate to the transactions at issue in this case. Assuming that Joseph Rauh could be individually liable *if* he personally directed fraudulent corporate actions, this Court cannot assert jurisdiction over him without allegations that he in fact did so or other evidence of minimum contacts with the forum.

## B. Venue

Plaintiff asserts that this Court is the proper venue for its action under 28 U.S.C. § 1391(b) which provides in part that in actions where federal jurisdiction is based at least in part on a federal question, venue is proper in the federal district where a substantial part of the events or omissions giving rise to the claim occurred. Plaintiff claims that a substantial part of the events giving rise to its claim occurred in Minnesota. As discussed in the Court's analysis of personal jurisdiction over James Rauh, the events giving rise to plaintiff's claims arose out of a business relationship between 3M in Minnesota and the defendants. In addition, defendants had contacts with Minnesota relating specifically to the transactions giving rise to the claim. Furthermore, plaintiff alleges trademark infringement based in part on solicitations and sales in Minnesota which caused injury to a Minnesota resident trademark holder.

Certainly not all of the events related to plaintiff's claim occurred in Minnesota. Significant events occurred in Texas and Ohio as well, and solicitations and sales were also made in other states. The current language of § 1391(b), however, recognizes that there may be more than one district in which a substantial part of the events giving rise to the claim occurred, and that venue would be proper in each such district. *Sidco Industries, Inc. v. Wimar Tahoe Corp.*, 768 F.Supp. 1343 (D.Or.1991). A substantial part of the events leading to infringement occurs both in the district where the infringer is located and in the district where the trademark owner is located and confusion is likely to occur. *Id.* Minnesota is the district both where the trademark owner is located and will be injured and one of several districts where confusion is alleged to have occurred. Venue is therefore proper in Minnesota.

## II. MOTION FOR PRELIMINARY INJUNCTION

3M moves the Court for preliminary relief on Counts One, Two, Three, Four, Six, Seven and Eight of its Amended Complaint. Count One is a federal claim for counterfeiting and infringement of 3M's registered trademarks. Count Two is a trademark dilution claim. Count Three is a breach of express contract claim. Count Four is a breach of implied contract claim. Count Six is a federal deceptive trade practices claim under the Lanham Act. Count Seven is a claim for common law trademark infringement of 3M's unregistered marks. Count Eight is a state law claim under the Minnesota Deceptive Trade Practices Act. To obtain preliminary injunctive relief, 3M must show: (1) a probability of success on the merits; (2) a threat of irreparable harm to 3M; (3) that the balance of hardships favors 3M; and (4) that granting preliminary relief favors the public interest. *Dataphase Systems, Inc. v. C.L. Systems, Inc.*, 640 F.2d 109, 114 (8th Cir.1981). The plaintiff bears the burden of proof on the four factors. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir.1987).

### A. Probability of Success on the Merits
#### 1. Breach of Contract Claims

The Court considers 3M's contract claims at the outset because, although 3M has brought a number of legal claims, 3M's claim that defendants breached an agreement is at the core of the parties' dispute.

### a. Express contract claim (Count Three)

 To prevail on the merits of a breach of contract claim, 3M must show (1) formation of the contract; (2) performance by 3M of any conditions precedent to its right to demand performance by defendants; and (3) breach of the contract by defendants. *Industrial Rubber Applicators v. Eaton Metal Prods. Co.*, 285 Minn. 511, 171 N.W.2d 728, 731 (1969). The key question in this case is whether a contract was formed. A contract is formed when an offer is accepted. *Farmers State Bank v. Sig Ellingson & Co.*, 218 Minn. 411, 16 N.W.2d 319, 323 (1944). Formation of a contract requires a meeting of the minds. The existence and terms of a contract are issues for the factfinder to determine.

 The parties agree that no written contract governed their transactions. 3M claims that it had an oral contract with Rauh Rubber, an essential term of which was that Rauh Rubber would not resell 3M's scrap reflective material, but would grind it up for use in rubber products. 3M asserts that Fred Kelly, a 3M employee in Brownwood, Texas, secured agreement from James Rauh that Rauh Rubber would use the scrap reflective materials only for grinding up and recycling into new products. As evidence of this agreement, 3M points to: (1) the fact that James Rauh gave Fred Kelly samples of rubber products made from the 3M materials; (2) language on the invoices accompanying the scrap materials which stated, "re-flective sheeting for recycle into rubber products" or "general recycle;" (3) a trip report from a visit Fred Kelly made to Rauh Rubber in March, 1994, during which James Rauh asked for permission to use the scrap as a reflective material and Kelly told him management would not approve of the use of the scrap for reflective sheeting purposes; and (4) a letter from Jack Lavold sent in October, 1993, (Pltf.Exh. 32) after sales of reflective materials to Rauh Rubber began.[3]

The Court has considered the evidence submitted by the parties, including the testimony and the credibility of the witnesses who testified during the preliminary injunction hearing. For the following reasons, the Court concludes that 3M has not demonstrated a likelihood of success on its express contract claim. First, there is no written evidence of a contract. The testimony during the hearing established that Fred Kelly believed he had an oral agreement with Rauh Rubber, but James Rauh testified that he never entered into such an agreement. James Rauh's testimony was consistent on this issue and his actions were consistent with his testimony. The parties agree, for example, that in 1990 Rauh refused to sign a "base" contract prohibiting resale of 3M scrap materials except as provided for in written addenda to the contract. After sales of reflective materials began, Rauh never acted as if he was bound by a contract with the terms claimed by 3M; rather, he began

---

**3.** The Lavold letter contained 3M's understanding of its agreement with Rauh Rubber on other products and stated that all materials received from any 3M plant anywhere in the world with 3M trademarks may not be used for their intended purposes and must be changed in some form. Plaintiff claims this letter serves as a confirmation of its oral contract with Rauh Rubber to which defendant did not object. Plaintiff cites Minn.Stat. § 336.2-201(2):

> Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of [the statute of frauds] against such party unless written notice of objection to its contents is given within ten days after it is received.

It is the Court's view, however, that 3M would be unlikely to succeed in any claim that the October, 1993 Lavold letter constitutes a confirmation of an oral contract pursuant to the provisions of section 336.2-201(2). Although its language attempts to sweep in all 3M products, it only clearly refers to salvage magnetic tapes. It does not directly refer to the scrap reflective materials shipped to Rauh from the Brownwood facility in Texas. Furthermore, Lavold was not involved at the time in any negotiations with Rauh over the reflective materials, so it seems unlikely that he was writing to confirm any such negotiations. In addition, the parties had negotiated specific contracts regarding different types of salvage materials, so it is unlikely that Rauh would have assumed that this letter would supersede the contracts. Rather, it would be likely that Rauh would interpret this letter to be confirmation of the parties' understanding regarding salvage tape materials, and nothing more. The terms of the letter are clearly not definite enough to form a contract on the reflective materials transaction.

investigating uses involving resale of the materials soon after obtaining them.

3M's witnesses were not consistent as to the existence of an express contract between 3M and Rauh Rubber. Jack Lavold testified that 3M rarely offered salvagers a written contract; rather, 3M reached verbal agreements to sell materials to salvagers and then cut off shipments if 3M did not approve of the salvager's use of the materials. Consistent with this policy, Rauh was "cut off" in September, 1994. Lavold testified that, in some circumstances, 3M and Rauh had negotiated specific written restrictions on Rauh's use of salvage materials. There were no similar specific written restrictions recorded, however, for the reflective materials at issue here. In fact, Lavold testified that he was not aware whether anyone at Brownwood had conveyed to Rauh any restrictions on the use of the salvage reflective materials.

Brownwood shipped the materials to Rauh, but had little prior experience negotiating with salvagers. Fred Kelly, the primary contact at Brownwood, was unaware of 3M's prior course of dealing with Rauh or what type of restrictions had been placed on Rauh and what form those restrictions had taken. He testified that he consistently told James Rauh that he could only grind up the materials and use them in manufacturing recycled rubber products, but his testimony was not confirmed by Lavold, by written communications, by 3M's later investigation, or by Rauh's testimony. Finally, the testimony of 3M witnesses demonstrates that after 3M discovered the attempted sales by Rauh, there was significant confusion within 3M as to whether there were written restrictions in place that could stop Rauh's sales and confusion as to who had been responsible for negotiating such restrictions. Given the conflicting testimony of 3M's witnesses and Rauh, the Court finds 3M has not shown that a jury would likely find that there was a meeting of the minds on the contract terms claimed by 3M.

Nor does the documentary evidence cited by 3M demonstrate a likelihood of success. Each document upon which 3M relies was generated by 3M. The non-trade invoices do not contain the terms of the agreement alleged by 3M; they merely state that the materials were for recycling. The October, 1993, letter from Jack Lavold to James Rauh indicates that it was sent to confirm a telephone conversation regarding the terms of an agreement reached as to materials not at issue in this lawsuit. It states that the agreement was the same one in effect for all materials sent to Rauh Rubber from any 3M plant. This letter, however, was sent after the arrangement for sale of scrap reflective materials was made in Texas. James Rauh testified in his deposition that he called Lavold upon receipt of the letter and informed him that he did not wish to receive any materials that 3M deemed "sensitive" or that he could not use in their original shape or form without a written agreement governing Rauh Rubber's sales.

Other evidence further supports the conclusion that 3M has not demonstrated a likelihood of success. There is evidence that at the time of the first sales of reflective materials to Rauh Rubber, 3M was under considerable pressure to dispose of the scrap reflective materials which it could no longer landfill without significant increased expense. When 3M personnel learned that Rauh Rubber was reselling scrap reflective materials and investigated, they concluded that 3M did not have a contract with Rauh Rubber. They shared this conclusion with 3M management in internal correspondence. A letter was drafted confirming 3M's understanding of its agreement with Rauh Rubber, but the letter was never sent to Rauh Rubber. Evidence was also presented indicating that 3M employees in the Resource Recovery Division in Minnesota and the 3M employees in Brownwood, Texas who negotiated with defendants each thought the other had taken responsibility for establishing contract terms with Rauh Rubber.

Given the equivocal nature of the evidence of an agreement, and the fact that 3M employees acted consistently with their written statements that a contract did not exist, the Court cannot conclude that 3M would likely persuade a jury that a contract existed and therefore has not demonstrated a likelihood of success.

### b. Implied contract claim (Count Four)

▮▮▮ Plaintiff also argues that an implied contract was formed by promissory estoppel.[4] Under promissory estoppel in Minnesota, a promise which is expected to induce definite action by the promisee, and does induce the action, is binding if injustice can be avoided only by enforcing the promise. *Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn.1992). The effect of promissory estoppel is to imply a contract from a unilateral or otherwise unenforceable promise coupled with detrimental reliance on the part of the promisee. *Del Hayes & Sons, Inc. v. Mitchell*, 304 Minn. 275, 230 N.W.2d 588, 593 (1975). Defendants argue that there was no clear and definite promise and that 3M cannot prove reliance. For the reasons stated above, the Court finds 3M has not demonstrated it is likely to succeed in proving that Rauh Rubber made such a clear and definite promise.

### 2. Trademark Infringement (Counts One and Seven)

▮▮▮ To demonstrate a probability of success on the merits of its statutory trademark infringement claim, 3M must prove ownership of a valid trademark and a likelihood that consumers would confuse the infringing mark with the registered mark. *Woodroast Systems, Inc. v. Restaurants Unlimited, Inc.*, 793 F.Supp. 906, 918 (D.Minn.1992), *aff'd*, 994 F.2d 844 (8th Cir.1993). The certificates of trademark registration plaintiff has submitted for "3M" and "Scotchlite" are prima facie evidence of the validity of the marks. 15 U.S.C. § 1057(b). Defendant has not contested the validity of 3M's registered trademarks. Plaintiff also contends it has common law trademarks in the terms "Diamond Grade," "High Intensity," and their abbreviations "DG" and "HI." Defendants do not contest plaintiff's claim to common law trademarks.

▮▮▮ The Court's analysis begins with the fundamental principle that trademark law does not prevent the sale of genuine goods bearing a true mark even if the sale is not authorized by the mark owner. *Prestonettes, Inc. v. Coty*, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924); *Polymer Technology Corp. v. Mimran*, 975 F.2d 58 (2d Cir.1992); *NEC Electronics v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987). The primary wrong a trademark action remedies is public confusion as to the true source of the goods; such confusion does not exist when a genuine product bearing a valid mark is sold. *Ford Motor Co. v. Cook*, 25 U.S.P.Q.2d 1050, 1054, 1992 WL 220614 (N.D.Ill.1992). If the goods are genuine, defendant has the right to resell them and plaintiff is not protected by the trademark laws.

The central issue to determining plaintiff's likelihood of success is therefore whether the materials 3M sold to defendants are "genuine" as defined by trademark law. Defendants argue that plaintiff has not shown a likelihood of success in demonstrating that the reflective materials are not genuine. Plaintiff argues it is likely to succeed in showing that the materials sold to defendants are not genuine because they do not meet 3M's quality control standards for sale as first-quality 3M material.

Several courts have held that trademarked products are not "genuine" if they are not subject to the manufacturer's quality control procedures. "One of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir.1986), *cert. denied*, 484 U.S. 817, 108 S.Ct. 71, 98 L.Ed.2d 34 (1987). In *El Greco*, a shoe manufacturer contracted with a factory to manufacture shoes bearing its trademark. *Id.* at 393. The manufactur-

---

4. Defendants argue that plaintiff's promissory estoppel theory is barred because it was not pleaded specifically. Plaintiff's Amended Complaint, however, contains separate counts for breach of contract and breach of an implied contract. Furthermore, the Minnesota Supreme Court has allowed a promissory estoppel theory to be raised for the first time on appeal because it is "essentially a variation of contract theory" which was pleaded. *Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 390 (Minn.1992).

er and the factory had an agreement that the manufacturer would inspect the shoes to ensure that they met the manufacturer's specifications and quality standards before approving the product for shipment. *Id.* When the manufacturer canceled two-deliveries due to delays in production, the factory was left with trademarked shoes it had already produced. The factory had no agreement with the manufacturer as to how to dispose of the inventory. The factory sold the shoes to a retailer who then sold them at lower prices than the manufacturer holding the trademark. The manufacturer sued the retailer for trademark infringement.

The court held that the shoes could not be considered genuine because the inspection step was "an integral part of [the manufacturer's] procedure for determining whether to accept shoes and allow them to be sold under its trademark." *Id.* at 395.

> The holder of a trademark is entitled to require, as El Greco did here, that no merchandise be distributed without its first being inspected by the holder or its agent to insure quality. Here, not only did El Greco not waive the right to such inspection, it required the inspection certificate as a condition for [acceptance and payment].

*Id.*

The broadest statement of a trademark holder's right to control quality is found in *Shell Oil Co. v. Commercial Petroleum, Inc.,* 928 F.2d 104 (4th Cir.1991). The court found that an oil wholesaler's sale of oil under Shell Oil's trademarks constituted trademark infringement and unfair competition because the wholesaler employed less stringent quality control standards than Shell Oil required of its authorized distributors. The court found that the quality control standards were an integral part of the product identified by the trademarks. *Id.* at 107. Without Shell's enforcement of its quality controls, the oil sold by the wholesaler was not "genuine." *Id.; see also Ford Motor Co. v. Cook,* 25 U.S.P.Q.2d 1050, 1992 WL 220614 (N.D.Ill.

1992); *Hunting World v. Reboans, Inc.,* 24 U.S.P.Q.2d 1844, 1992 WL 361741 (N.D.Cal. 1992).

█ Based on the testimony and the affidavits submitted, the Court finds that plaintiff has demonstrated that *some* of the reflective materials sold to Rauh were not genuine 3M materials. The Court heard extensive testimony on 3M's quality control procedures. It is undisputed that 3M sold to defendants reflective materials which were either excess first-quality materials, including sidecuts from rolls of first-quality materials, or were materials which had failed 3M's quality control process. The materials sold to defendants were not marked to distinguish between surplus first-quality and rejected materials; thus defendants are unable to distinguish between these categories of material.[5] 3M has submitted sufficient evidence to establish that it would likely succeed in proving that the rejected reflective materials sold to defendants were not genuine. The evidence also demonstrates, however, that Rauh Rubber would likely succeed in demonstrating that 3M also sold it genuine materials which 3M had scrapped rather than sell through its authorized dealers.

3M has no likelihood of success on its trademark infringement claim with respect to the genuine goods. *See Prestonettes, Inc. v. Coty,* 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924). 3M's trademark infringement claim with respect to the non-genuine goods, however, is likely to succeed. Courts have been more likely to enforce trademark holders' rights to enforce their quality control standards when the products are likely to contain latent defects of which consumers may be unaware. The Fifth Circuit has limited the *Shell Oil* rule that the manufacturer has a right to control the quality of its product to such cases. In *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.,* 988 F.2d 587, 591 (5th Cir.1993), the court noted the importance of the element of consumer confusion and stated:

> be unlikely to persuade a jury that defendants were capable of sorting first-quality from rejected materials.

---

5. Defendants' testimony regarding Rauh Rubber's attempts at quality assurance, such as a flashlight test to examine reflective quality and a "thumb" test to examine adhesive quality, would

The common thread in [the prior cases] where trademark infringement was found is that each involved some defect (or potential defect) in *the product itself* that the customer would not be readily able to detect. The oil, shoes, and beer from *Shell, El Greco,* and *Coors,* all contained or could contain a latent product defect due to the unauthorized distributor's failure to observe the manufacturer and mark owner's rigorous quality control standards. Most importantly, a consumer would not necessarily be aware of the defective condition of the product and would thereby be confused or deceived.

*Id.* at 591. *See also Ford Motor Co. v. Cook,* 28 U.S.P.Q.2d 1316, 1317, 1993 WL 217235 (N.D.Ill.1993) ("the public is deceived when one person sells an inferior product of another as the other's product. Such conduct tends to injure reputation and goodwill, constitutes unfair competition and is a fraud and deception upon the public.").

Plaintiff has made some showing that defendants' use of the 3M name and its product names and codes in connection with the sales of its rejected materials may cause consumer confusion, the central test of trademark infringement. 3 *McCarthy, Trademarks and Unfair Competition* § 23.01[1] at 23–6 to 23–7. The existence or likelihood of customer confusion was highly contested in this case. 3M has not alleged that customers will be confused as to the source of the reflective materials; rather, 3M claims that customers are likely to be confused as to the quality of the 3M trademarked goods sold by Rauh Rubber. 3M claims that Rauh is representing the goods as first quality reflective products when they may in fact have defects which consumers could not detect. Rauh argues that there is no evidence in the record that any of 3M's customers were confused by Rauh's sales.

Most of the evidence in the record regarding consumer confusion was generated by 3M customers' inquiries to 3M after receiving sales solicitations from Rauh. A number of 3M customers ultimately provided affidavits which indicate that they received solicitations from Rauh, and understood that Rauh or GAIA was selling 3M reflective materials at significantly lower prices than 3M. There is no evidence that Rauh ever misrepresented himself, Rauh Rubber, or GAIA as being a licensed 3M dealer. In fact, several customers told Rauh that they dealt only with authorized 3M dealers and therefore would not buy from Rauh or GAIA. Most customers apparently understood that the materials offered were not sold by 3M; some were told only that the materials were "bulk" or "surplus;" others were specifically told that Rauh or GAIA had inspected 3M materials, culled defects, and were offering "good" materials. The one customer whom 3M cites as believing it would receive material equivalent in quality to first quality 3M materials, Stonehouse Signs, in fact returned the material to GAIA. 3M has demonstrated that it may be able to prove that one 3M customer, Ravens Metal, was sold material 3M had scrapped as experimental without disclosure of that fact. On this record, the Court finds that 3M has shown that it may succeed in demonstrating a likelihood of consumer confusion, but 3M's evidence of confusion is not strong.

 Although 3M has shown that it owns valid trademarks and some evidence that consumers may be confused as to the quality of the trademarked goods sold by defendants, the right of a trademark holder to control quality may not be absolute. In determining whether a trademark holder retains a right to impose its own quality control on materials released into the marketplace, some courts have considered whether the holder took adequate steps to protect itself from misuse of its trademarked products through contractual agreements regarding their use or resale. The fact that the factory in *El Greco* had agreed to the manufacturer's inspection for quality after production was crucial to the court's finding that El Greco had not waived its right to enforce its quality control over the product.[6] A court found

---

**6.** A dissenting judge in *El Greco* would not have found infringement because the manufacturer had not directed the company as to how to dispose of the canceled goods or unambiguously restricted it from independently distributing them; thus, both the majority and the dissent considered contractual agreements relevant in

such a waiver when the trademark holder specifically instructed the manufacturer that he "did not care" how he disposed of canceled goods. *Diamond Supply Co. v. Prudential Paper Products Co.*, 589 F.Supp. 470 (S.D.N.Y.1984). The Eighth Circuit Court of Appeals noted the importance of a failure to secure contractual restrictions over resale of genuine goods in *Henry v. Chloride*, 809 F.2d 1334, 1350 (8th Cir.1987) ("[H]ad Chloride wished to prevent the use of its name in any form on its unaltered, first-quality product, it could have contracted for that very arrangement."); *see also Alfred Dunhill, Ltd. v. Interstate Cigar Co.*, 499 F.2d 232 (2d Cir.1974) ("If Dunhill had wished to distinguish the salvaged tobacco from that sold through its normal channels of distribution, it should have done so while the allegedly damaged tobacco was still under its control and before it was released into the salvage market.").

Plaintiff in this case had control over the reflective materials and their release into the stream of commerce. As discussed above, plaintiff has not demonstrated it would likely succeed on its claim that a contract circumscribed defendants' right to use the reflective materials.[7] Given that a jury would most likely find plaintiff sold the reflective materials without obtaining defendants' agreement to restrictions on the resale of the materials, plaintiff is "seeking the protection of the trademark laws to insulate itself from what it placed in motion itself. . . ." *See Parfums Stern, Inc. v. U.S. Customs Service*, 575 F.Supp. 416 (S.D.Fla.1983) (denying motion for preliminary injunction). 3M's failure to protect itself from the harm it now alleges has some bearing on the Court's evaluation of the necessity for preliminary relief.

In sum, the Court concludes that, at best, 3M has shown it will likely succeed at proving that some of the materials sold to defendants were not genuine materials and that there is some likelihood consumers would be confused as to the quality of those goods,[8] but that 3M did not demonstrate a likelihood of proving it took any steps to limit defendants' use of these materials when it sold them to defendants together with scraps of first-quality genuine 3M materials.

**3. Trademark Dilution Claim (Count Two)**

Section 43(c) of the Lanham Act provides a remedy for dilution of famous trademarks.[9] Under the statute, the owner of a famous mark is entitled to an injunction against another person's commercial use of a mark if it causes dilution of the distinctive quality of the mark. 15 U.S.C. § 1125(c). Trademark dilution is "a weakening or reduction in the ability of a mark to clearly and unmistakably distinguish one source." 3 *McCarthy, Trademarks and Unfair Competition* § 24.13[1][a]. Trademark dilution may be found even where there is no likelihood of consumer confusion. *Id.* at § 24.13[1][b].

Trademark dilution may involve either "blurring" or "tarnishment" of the mark. Blurring occurs when, although consumers are not confused as to the source of a mark, the mark's appearance on other, unrelated goods weakens the distinctive link between the mark and the trademark holder's goods. *See, e.g., Mead Data Cent., Inc. v. Toyota Motor Sales, Inc.*, 875 F.2d 1026 (2d Cir.1989). There is no evidence of blurring in this case because the alleged infringing materials are plaintiff's own goods. Tarnishment results from unauthorized use which

determining whether plaintiff's trademark was infringed.

7. Plaintiff has implicitly acknowledged this interrelationship between its claims. In its reply memorandum in support of its motion for a preliminary injunction, plaintiff explains the outcome of the *Alfred Dunhill* case by noting that the trademark holder in that case admitted selling its goods without restriction. Given that plaintiff has not shown a likelihood of proving that it had any restriction in place on the goods it sold to defendants, plaintiff is in the same posture as the plaintiff in the *Alfred Dunhill* case.

8. Defendants claim there is no evidence of consumer confusion. The evidence established that defendants themselves could not accurately determine the quality of the materials they seek to sell; thus, 3M has shown some likelihood that consumers would be confused.

9. Trademark dilution was made part of the Lanham Act in a 1996 amendment. Pub.L. 104–98, § 3(a).

tarnishes, degrades or dilutes the mark's distinctive quality. Successful tarnishment claims generally involve uses of the trademark in an "unwholesome or degrading context." 3 *McCarthy on Trademarks and Unfair Competition*, § 24.16[1]. "The threat of tarnishment arises when the goodwill and reputation of a plaintiff's trademark is linked to products which are of shoddy quality or which conjure associations that clash with the associations generated by the owner's lawful use of the mark." *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26 (1st Cir.), *cert. denied and appeal dismissed*, 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987).

■ Plaintiff has not cited any cases where a court has found trademark dilution from use of the trademark holder's own products. The only evidence plaintiff cites in support of its dilution claim is the fact that a 3M employee was "horrified" because customers had "lost confidence in 3M, or at a minimum, expressed doubt in 3M." The fact that one of plaintiff's employees had such a concern does not demonstrate a likelihood of success on a trademark dilution claim.

### 4. Deceptive Trade Practices Claims (Counts Six and Eight)

■ Plaintiff also bases its request for preliminary relief on the Minnesota Deceptive Trade Practices Act and the Lanham Act. Under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1):

Any person who, on or in connection with any goods ... uses in commerce any false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to ... the origin, sponsorship or approval of his or her goods ..., or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, [or] qualities ... of his or her or another person's goods ...,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

To recover on such a claim, the plaintiff must prove two elements. First, plaintiff must prove what factual message or claim was made to the consumer. Second, plaintiff must prove the false or misleading nature of the representation as a matter of fact. 3 *McCarthy, Trademarks and Unfair Competition* § 27.07[2][a] and [d]. "To obtain an injunction under § 43(a), [plaintiffs] need only show that the falsities complained of had a tendency to deceive.... A finding of tendency to deceive satisfies the requisite of irreparable harm. *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746 (8th Cir.1980). It is not required that the plaintiff show intent to deceive or actual deception.

Plaintiff cites several subdivisions of Minnesota's Deceptive Trade Practices Act as applicable to defendants' conduct. The statute makes it a deceptive trade practice for one, in the course of business, to:

(2) [cause] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; ...

(5) [represent] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

(6) [represent] that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used, or secondhand;

(7) [represent] that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another; ...

Minn.Stat. § 325D.44, subd. 1(2), (5), (6), (7). A person likely to be damaged by a deceptive trade practice of another may be granted an injunction. Minn.Stat. § 325D.45, subd. 1. Proof of intent to deceive is not required. *Id.*

■ Plaintiff has demonstrated, as discussed above with respect to plaintiff's trademark infringement claim, a likelihood of success in demonstrating that defendants' representations regarding the quality of the 3M reflective materials were false or mis-

leading and that they had at least a tendency to deceive. The Court therefore finds that plaintiff has demonstrated a likelihood of success on the merits of its deceptive trade practices claims under 15 U.S.C. § 1125(a)(1)(B) and Minn.Stat. § 325D.44, subd. 1(6) and (7).

## B. Irreparable Harm

 3M alleges that there will be irreparable harm to its reflective materials business if defendants are allowed to continue selling its defective products to 3M customers. In trademark cases, courts may presume irreparable harm when a likelihood of confusion is demonstrated. *Calvin Klein Cosmetics v. Lenox Laboratories,* 815 F.2d 500, 505 (8th Cir.1987); *General Mills, Inc. v. Kellogg Co.,* 824 F.2d 622 (8th Cir.1987). The evidence of customer confusion presented in this case was not strong, and only a clear showing of confusion generates the presumption of irreparable harm.

 Plaintiff has demonstrated, however, that sales of the non-genuine goods sold to defendants and bearing its trademarks may cause it irreparable harm. Courts have found the sale of trademarked products which are defective to create the possibility of damage to goodwill and reputation. *Ford Motor Co.,* 25 U.S.P.Q.2d at 1055. In evaluating the threat of irreparable harm, courts may also consider the potential loss of control over the quality of plaintiff's product and the risk of damage to a plaintiff's reputation and trademark from the continued use of an infringing mark. *Woodroast,* 793 F.Supp. at 918. The Court finds that, as to the non-genuine goods, plaintiff has demonstrated that the loss of control over the quality of its product risks damage to its reputation and trademark.

## C. Balance of the Harms

 This factor requires the Court to consider any possible harm to the defendant from granting a preliminary injunction and to balance it with the harm to the plaintiff if the plaintiff is denied preliminary relief, but is later successful on the merits. In essence, this factor requires the Court to balance the equities in considering what type of temporary relief, if any, is warranted under the unique factual circumstances presented in this case. Plaintiff has demonstrated a likelihood of success at proving trademark infringement and is entitled to preliminary relief with respect to the non-genuine materials. On the other hand, plaintiff sold those materials without restriction together with materials which plaintiff has failed to demonstrate its entitlement to protect. Defendants are entitled to sell the genuine materials they obtained from 3M, but have not presented evidence sufficient to demonstrate that they are capable of distinguishing genuine from non-genuine materials in their possession. In this case, the Court considers the scales to be closely balanced.

This situation calls for an equitable remedy during the pendency of this lawsuit which is suited to this unique posture. The potential harm to the plaintiff if injunctive relief is denied and plaintiff later succeeds in its claims on the merits is considerable. The potential harm includes intangible effects such as loss of goodwill and injury to reputation which may never be remedied by money damages. In weighing this harm, the Court notes that plaintiff had the opportunity to contract specifically with defendant to prevent the harm from impermissible use of the materials, but it did not do so. Furthermore, the identified harm to plaintiffs will occur only if the defendants misrepresent defective 3M materials as first-quality goods in the marketplace. The buyers in the market for the goods at issue are relatively sophisticated, and if the materials are sold with a clear disclosure that they may not be first-quality goods, the extent of the potential harm to the plaintiff is significantly lessened.

The potential harm to the defendant if a preliminary injunction is found to have been improperly granted would seem to be easily quantifiable in terms of lost sales. Certainly plaintiff would be readily able to pay such damages to defendant and those damages are quantifiable. The Court must also consider less quantifiable potential harms to defendants, however. Rauh Rubber and GAIA are small companies whose ability to withstand lost sales for a significant period of time may be questionable.

The complicating factor in determining the appropriate preliminary relief is the fact that the genuine and non-genuine materials are, for purposes of this motion, inseparable. The Court's remedy therefore must apply to all of the materials at issue. Treating all of the materials as genuine would allow defendants unfettered sales without restrictions, with the resulting risk of irreparable harm to plaintiff of sales of defective materials as first-quality materials. Prohibiting all sales would deprive defendants of their right to sell the genuine materials. The Court therefore finds that the threat of sales without specific disclosures regarding the quality of the goods tips the balance of harms in plaintiff's favor, but only to the extent of avoiding that specific harm.

### D. The Public Interest

The last factor the Court considers is the public interest. The Court may consider the interest in protecting the public from confusion or deception and the public interest in a competitive marketplace. *Aveda Corp. v. Evita Marketing, Inc.*, 706 F.Supp. 1419, 1432 (D.Minn.1989). Where the moving party has demonstrated that misrepresentations are being made in the marketplace, the public interest favors injunctive relief. *Id.* In this case, the public would be harmed if unwarranted, nongenuine, possibly defective 3M materials continued to be misrepresented as first-quality goods in the marketplace prior to a decision on the merits in this case.

### E. Conclusion

Weighing the equities at this preliminary stage and noting the extraordinary nature of preliminary relief, the Court finds that the status quo can best be preserved pending a full determination on the merits of plaintiff's claims by entering a preliminary injunction prohibiting defendants from selling any reflective materials without explicit disclosures stating that the materials may be defective or scrap materials rejected by 3M, but allowing such sales of any of the materials in defendant's possession.

The Court finds support for requiring the disclosures even as to the genuine goods by viewing the defendants' relationship to the plaintiff and the genuine goods in question as analogous to that of a distributor holding damaged or inferior-quality goods. Even if goods are genuine, a dealer cannot sell defective merchandise under the original mark without so indicating. *Intel Corp. v. Terabyte Int'l Inc.*, 6 F.3d 614 (9th Cir.1993); *Adolph Coors Co. v. A. Genderson & Sons, Inc.*, 486 F.Supp. 131 (D.Colo.1980) (stale beer); *Polaroid Corp. v. Blue Dot Corp.*, 214 U.S.P.Q. 192, 1981 WL 48175 (D.N.J.1981) (expired film). Given that defendants cannot distinguish genuine from non-genuine goods, defendants must treat all materials as if they may be defective.

The harm of customer confusion as to quality, however, will be eliminated if defendants are required to disclose the exact nature and quality of the trademarked materials. The Court therefore finds that any harm to plaintiff from the sales of the reflective materials at issue can be cured during the pendency of this lawsuit by requiring the defendants to fully and accurately disclose the nature of the materials. The Court will require defendants to clearly label the products as rejected or scrap material in a manner that will preclude confusion as to the source or quality of the goods. This injunction will also prevent any deceptive trade practices pending a final determination on the merits of plaintiff's claims.

### ORDER

Based on the submissions of the parties, the arguments of counsel and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' motion to dismiss for lack of personal jurisdiction over James Rauh [Docket No. 23] is **DENIED.**

2. Defendants' motion to dismiss for lack of personal jurisdiction over Joseph Rauh [Docket No. 23] is **GRANTED.**

3. Defendants' motion to dismiss for improper venue [Docket No. 23] is **DENIED.**

4. Plaintiff's motion for a preliminary injunction [Docket No. 45] is **GRANTED IN PART.** The terms of the Court's Temporary Restraining Order of March 8, 1996 shall

continue to apply until the Court enters a final Order for Preliminary Injunction. The parties may submit by October 23, 1996, proposed language for a disclosure to accompany all sales of plaintiff's products by defendants for incorporation in the Court's final Order. The Court will review the proposed language and issue a final Order for Preliminary Injunction as soon as possible thereafter.